**DAILEY et al., Appellants,**

v.

**EATON CORPORATION et al., Appellees.**

[Cite as *Dailey v. Eaton Corp.* (2000), 138 Ohio App.3d 575.]

Court of Appeals of Ohio,
Third District, Marion County.

No. 9–2000–14.

Decided Aug. 22, 2000.

576

*Kevin J. Boissoneault, Brian J. Judis,* for appellants.

*Harry T. Quick,* for appellees.

THOMAS F. BRYANT, Judge.

This appeal is taken by plaintiff–appellant Steven F. Dailey from the judgment of the Court of Common Pleas of Marion County granting defendant–appellee Eaton Corporation's ("Eaton") motion for summary judgment.

On December 12, 1997, Steven F. Dailey was seriously injured in a fire and explosion at Eaton's forge plant in Marion, Ohio. Dailey was employed at Eaton as a journeyman electrician.

Eaton manufactures several large steel components for vehicles such as buses and tractors. In order to manufacture the parts correctly the steel must be heated to extremely high temperatures so that it can be pressed. If the steel is not at a high enough temperature before it is pressed the cranks in the press will shatter. The energy necessary to heat the steel is supplied through the north electrical substation ("substation") outside the plant. Located inside the substa-

tion is a control panel containing a circuit breaker on the power line that supplies power to the two steel presses in the forge shop inside the factory.

Inside the circuit breaker there is a set of contacts immersed in oil. The oil is there to act as an electrical arc suppressant. Below the contacts is a small pin or hammer, a device that opens and closes the contacts. Just beyond the circuit breaker are three transformers that reduce the voltage to a usable level (34,500 volts) supplied through the circuit breaker.

When there is a system overload, the circuit breaker opens deliberately forcing the contacts open. There are two ways to close the contacts and reset the circuit breaker. Inside the factory, the employee running the press can close the contacts by pushing a button in the press causing a pneumatic close by air pressure forcing the pin or hammer upward closing the contacts and reversing the overload. The pneumatic close of the contacts is usually fairly quick, for a slow close causes an electrical arc to form between the contacts that may result in a fire. The contacts may also be closed manually.

Two days before the accident, electrician Russel Comstock noticed that the circuit breaker in the substation that supplied the 60,000–pound press with energy kept overloading. After investigating, Comstock reported to his supervisors that the circuit breaker was "slapping in and out" and the contacts would not stay closed.

His supervisors remarked that this had happened a few years ago and that in order to control the contacts it was necessary to manually open the control panel in the substation and force the contacts up or "jack" them up with a screw driver. All the supervisors were made aware of this problem and in response they ordered a new circuit breaker and told the electricians on duty how to manually keep the contacts closed until the new piece arrived. Comstock testified that he told Dailey about the problem and informed him that he might need to manually close the contacts if the circuit breaker should overload. The record is equally clear that Dailey was never told an exact procedure for closing the contacts. Moreover, Dailey had never manually closed circuit breaker contacts before.

On the night of December 12, several hours before the accident, Dailey was informed by the employee running the press that the circuit had overloaded and the steel was not heating. He also told Dailey that the pneumatic reset switch was not working. In response Dailey went to the substation to manually close the contacts. Upon arrival Dailey "jacked" the contacts up with a hydraulic jack and left the jack in position inside the control panel housing, the jack extended to the point at which the contacts snapped closed, preventing the contact points from fully opening thereafter.

At approximately 5:00 a.m. on December 12, 1997, forge shop supervisor Dan Bolton told maintenance supervisor Leonard Maynard that he smelled smoke in the substation and Maynard went to the substation to investigate. He also directed others to tell Dailey to join him there. A fire was burning in the control panel housing at the circuit breaker for the press. The circuit had once again overloaded but the contacts of the circuit breaker could not fully open because they were prevented by the extended jack. As a result, an electric arc occurred between the partly opened contact points and the fire ensued.

Inside the substation, Maynard used a fire extinguisher to attempt to extinguish the fire in the circuit breaker. Dailey arrived and entered the substation and tried unsuccessfully to remove the jack from the circuit breaker. Meanwhile the forge shop supervisor, Bolton, had entered the substation with Maynard, when suddenly three separate successive explosions occurred injuring Bolton, Maynard and Dailey.

Eaton had established a system for response to fires. According to the Eaton rule for response, once a fire is located, the supervisor on duty is required to notify the guard to call the fire brigade and the fire department. The fire brigade is a group of employees whose responsibility it is to handle a fire until the fire department arrives. The fire brigade has had special training for fighting fires. The supervisors on duty in this case failed to follow company procedure and the fire brigade and the fire department were not called until after the explosion.

On December 7, 1998, Stephen Dailey, his wife and their minor child filed a complaint against Eaton alleging that Eaton had "intentionally, purposefully, knowingly and with substantial certainty" required Dailey to do work that resulted in his serious injury. On September 22, 1999, after several months of discovery, Eaton filed a motion for summary judgment. Dailey responded accordingly.

On January 28, 2000, the trial court granted Eaton's motion for summary judgment holding that Dailey had failed to show the existence of a genuine issue of material fact with respect to all of the elements of an employer intentional tort. The trial court reasoned that Dailey had shown that there was a genuine issue of material fact as to whether or not Eaton knew that there had been a dangerous condition at the plant. However, the trial court further found that Dailey had failed to show that Eaton knew with substantial certainty that Dailey would indeed be injured by that dangerous condition and furthermore Dailey had failed to provide evidence that Eaton required him to fight the fire.

On appeal from that judgment Dailey makes the following sole assignment of error:

"The trial court erred as a matter of law when it granted Defendant–Appellant Eaton Corporation's motion for summary judgment."

Dailey's principal argument in support of his sole assignment of error claims that the trial court incorrectly granted summary judgment when issues of material fact exist.

When reviewing summary judgment, we review the judgment independently without any deference to the previous determination made by the trial court. *Conley–Slowinski v. Superior Spinning & Stamping Co.* (19898), 128 Ohio App.3d 360, 714 N.E.2d 991. The standard of review in this court is *de novo. AAAA Ent., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597.

Civil Rule 56 requires the court to determine from the materials properly to be considered and timely filed in the action, resolving all doubts against the movant, that no genuine issue exists as to any material fact, that reasonable minds could reach no other conclusion and that the moving party is entitled to judgment as a matter of law. Therefore summary judgment is appropriate only when the following have been established: (1) that there is no genuine issue as to any material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that when construing the evidence most favorable in the light of the non-moving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Civ.R.56(C); *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881.

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

Once the moving party meets its burden, the nonmoving party then has a reciprocal burden to set forth specific facts showing that there is a genuine issue of material fact for trial. *A. Doe v. First Presbyterian Church (USA)* (1998), 126 Ohio App.3d 358, 364, 710 N.E.2d 367, 370–371; Civ. R. 56(E). The nonmoving party may not rest on the mere allegations of her pleading. *State ex rel. Burnes v. Athens Cty. Clerk of Courts* (1998), 83 Ohio St.3d 523, 524, 700 N.E.2d 1260, 1260–1261, citing *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197, 1199; Civ.R. 56(E). Most importantly, the nonmovant's failure of proof on an essential element of the case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265, 273–274.

Dailey makes several arguments in support of his contention that the trial court committed prejudicial error when it found no disputed issues of material fact. Initially, Dailey contends that the trial court misapplied the standard of proof required by Civil Rule 56(C) because it failed to construe all of the evidence most strongly in favor of Dailey. Next Dailey claims that a genuine issue of material fact existed as to whether by requiring its employees to fight electrical fires in contravention of its usual safety rules and fire fighting plan Eaton was "substantially certain that harm would be caused to those employees." Finally, Dailey argues that there is a genuine issue of material fact concerning whether Eaton Corporation required Steven Dailey as part of his job to attempt to extinguish the electrical fire despite its knowledge that his injury was "substantially certain" to occur.

As stated above, we review a summary judgment independently of the trial court's decision. Should Dailey have failed to offer evidence, which if believed, would tend to prove an essential element of an employer intentional tort, the remaining fact issues are immaterial.

■ Generally, an employee's only recourse for compensation due to injury sustained in the course of employment in Ohio is the worker's compensation system. However, under the common law, an injured employee may seek compensation directly from the employer if the injury was the result of an intentional tort by the employer. *Blankenship v. Cincinnati Milacron Chem., Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572.

■ In order to determine whether an employer has indeed committed an intentional tort resulting in injury to the employee, the trier of fact must apply the following tripartite analysis set forth by the Ohio Supreme Court in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108:

"(1) [K]nowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;

"(2) [K]nowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and

"(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." *Id.* at paragraph one of the syllabus.

## A. Dangerous Condition

■ The first element necessary for proof that Eaton committed an intentional tort is that the employer, Eaton, must have had knowledge "of the existence of a dangerous process, procedure, instrumentality or condition within

its business operation." In order to satisfy the first prong then Dailey must show: 1) there was a dangerous condition and 2) that Eaton had knowledge that the dangerous condition existed.

In determining whether the condition or procedure was indeed dangerous this court cautioned:

"[D]angerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach." *Naragon v. Dayton Power & Light Co.* (March 30, 1998), Shelby App.No. 17–97–21, unreported, 1998 WL 142386, citing *Brady v. Safety–Kleen* (1991), 61 Ohio St.3d 624, 576 N.E.2d 722.

It must be remembered that those injuries that occur in the scope of employment by definition are not intentional torts. "[A] workplace intentional tort is one suffered outside the scope of employment, beyond the 'natural hazard[s]' of one's employment. Were it otherwise, any injury associated with inherently dangerous work" like high voltage electrical work, "could subject an employer to intentional tort liability, whatever the cause." *Naragon* at 7.

In order to determine whether the employer had knowledge that such a condition or procedure was dangerous this court must determine the employer's actual knowledge of the dangerous condition. *Fultz v. Baja Boats, Inc.* (Feb. 18, 1994), Crawford App. No. 3–93–10, unreported, 1994 WL 49934. This court has cautioned:

"[T]hat this is not the 'reasonable person' standard for determining negligence or recklessness; that is, the fact that the employer should have known it was requiring the employee to work under such dangerous conditions that he would certainly be injured is not enough to establish a case in intentional tort. Rather, the determination rests upon a claimant's alleging facts which show the employer's actual knowledge of the situation."

Therefore the scope of our inquiry must focus on whether Dailey has presented evidence from which it might be found that this was an injury associated with "inherently dangerous" work outside the scope of Dailey's employment and Eaton had knowledge that the work was dangerous.

The crux of this element turns on what the dangerous condition is. Dailey contends that the dangerous condition was the fire itself. While Eaton claims that the dangerous condition was created by Dailey without the knowledge of his supervisors by allowing the hydraulic jack to remain too close to the contacts in the electrical panel to permit them to open. Eaton argues the contacts couldn't open fully and an electric arc formed across the contacts causing the fire.

■ Our review of the record leads us to the conclusion that the "fire" in the electrical substation was indeed the dangerous condition at issue for the fire caused Dailey's injury. Moreover, Eaton must concede knowledge of the danger of fire occurring in its plant because it has established a special rule of procedure for fighting fires.

The complaint filed by Dailey alleges that the fire and his resulting injury comprised the essential elements of the intentional tort. Dailey has presented evidence that he had not received any lengthy training concerning the correct way to manually close the circuit breaker and had never done it before. Eaton knew that the circuit had been overloading constantly for two days, that the contacts were not closing pneumatically, and had ordered the electricians to "jack" the contacts up.

Eaton claims that steel shavings often catch fire in the plant because of the high degree of heat required to press the steel and that the fire brigade is not always called because they are not required to be called at all times. The record before us is unclear about whose responsibility it is to fight all fires that occur within the plant and exactly how serious the fire must be to call the fire brigade. However, it is clear that a fire brigade whose job it was to fight fires had been established and at that the sign of a fire the supervisor on duty was required to call the guard who in turn would notify the fire brigade and the fire department.

Because Dailey was injured by the fire and explosion that occurred within the electrical substation and he has presented evidence to support his complaint that alleged the same, we conclude that the fire is indeed the dangerous condition put at issue. Moreover, by the institution of a fire fighting safety plan Eaton has recognized the danger that fires may cause to its employees. That safety plan mandates that only employees who are members of the fire brigade fight the fires. On the morning of the fire Dailey was not a member of the fire brigade. Thus the evidence before us construed in the light most favorably to Dailey supports the assertion that fighting fires was dangerous work outside the scope of Dailey's employment and Eaton knew that the work was dangerous. Therefore, Dailey has satisfied the first prong necessary for proof of an intentional tort.

### B. Injury is Substantially Certain

■ The second element necessary for proof that an employer committed an intentional tort is whether the employer knew that if the employee was subject to the dangerous condition "then harm to the employee will be a substantial certainty." *Fyffe* at paragraph one of the syllabus. In applying the second prong of the *Fyffe* test, we have previously held that substantial certainty is "greater than an employer's knowledge of a high risk of harm or danger." *Cathey v. Cassens Transport Co.* (Feb. 4, 2000), Union App. No. 14–99–35,

unreported, 2000 WL 126654. See also *Jenkins v. Quincy Foundry, Div. of Warren Tool Co.* (Feb. 23, 1990), Logan App. No. 8–88–26, unreported, 1990 WL 16523; *Myers v. Oberlin Processing, Inc.* (Sept. 27, 1996), Seneca App. No. 13–96–20, unreported, 1996 WL 547920.

Dailey claims that conscious disregard for a well known and long established safety procedure instituted to protect employees from injury constitutes actual knowledge that injury will occur to the employees involved and thus he has satisfied the second prong essential for proof of an employer intentional tort. Specifically he claims that conscious disregard for the long-standing policy instituted to protect employees is much more than knowledge that there is a high risk of harm or danger. Rather it might be found to be a willful or purposeful decision that will almost assuredly result in injury.

In *Hartley v. Marion Steel Co.* (Oct. 4, 1996), Marion App. No. 9–96–30, unreported, 1996 WL 562054, an employee was injured by an explosion of heat resulting from a huge spill of molten steel. The employer had a long-established safety procedure that was to be followed during the transportation of molten steel. The safety procedure was followed and despite this, an unexpected accident occurred causing the cradle transporting the molten steel to break and resulting in the explosion. Because the employer had followed its safety plan we reasoned that "[a]ppellee appreciated the risk that molten steel or other objects falling several feet onto employees would be dangerous, and attempted to avoid this type of accident." *Hartley* at 4.

In *Hartley*, the employer had instituted a safety plan to protect the employees from injury caused by an inherently dangerous condition, the transportation of molten steel. Similarly here, Eaton had instituted a safety plan to protect Dailey from an injury caused by an inherently dangerous condition, fires. Further, in *Hartley* the employer followed the safety procedure and, unfortunately, an employee was still harmed. However, Eaton failed to follow its established safety procedure for controlling electrical fires and three employees, including Dailey were injured. Moreover, Bolton, a supervisor at Eaton on duty the night of the fire testified that he consciously thought about following the safety procedure and calling the fire brigade but did not do it. Finally, the injury suffered by the employee in *Hartley* was not the result of the inherently dangerous condition, the molten steel. It resulted from heat caused by an unforeseen explosion. In contrast, Dailey was injured by a fire, the inherently dangerous condition the safety procedure was instituted to prevent.

Therefore, because the evidence reveals that Eaton (1) knew fires caused injury, (2) had established a safety procedure for preventing that injury, and finally, (3) actively disregarded that procedure in light of its risks, we conclude that conscious disregard of a long-standing safety policy instituted to prevent

employees from injury by fire may constitute actual knowledge of the danger of an employee's injury by a fire in the factory. Whether or not that injury is known to be substantially certain to occur is an issue of fact.

However, it should be noted that Eaton did indeed have a fire brigade that consisted of specially trained employees whose job it was to fight fires until the fire department arrived. According to Joseph Higley those employees meet once every two months, are given special training at the meetings, are provided with special fire retardant gloves and fire-fighting equipment. In addition, those employees receive additional compensation for their duties.

Further, the record reveals that Dailey was not a member of the fire brigade and was not equipped with special equipment or training necessary for fighting fires as a member of the fire brigade. It naturally follows that because Eaton supplies specific employees with specialized equipment and training to fight fires in order to prevent untrained employees from being injured it might be found that if Eaton required Dailey to fight the fire at issue here without that specialized training or equipment then it did so knowing Dailey's injury was "substantially certain" to occur.

However, the record contains conflicting evidence as to when the policy comes into effect and whether it applied to the fire by which Dailey was injured. Several employees of Eaton testified that small fires often occur inside the factory and are often caused by the high temperature of the steel and the fire brigade does not respond. Moreover, it is undisputed that the fire brigade is not required to respond to every fire. However, although it is to respond to certain fires, exactly to which fires it is to respond and whether or not the fire at issue before us qualified is unclear and remains at issue.

Thus, construing the evidence before us in the light most favorable to the nonmovant, Dailey, this court holds that there is a genuine issue of material fact as to whether or not the policy was indeed implicated and consciously disregarded, with knowledge that injury by fire was substantially certain to occur.

### C. Requirement that the employee perform the dangerous work.

The third and final element essential for proof of an employer intentional tort requires the employee to show that he was required to perform the dangerous task.

The record reveals that Dailey's supervisor, Maynard, summoned Dailey to the substation where the fire occurred. This is not in dispute. What remains in dispute is whether or not that is enough evidence to conclude that Dailey was required to remain in the substation once he arrived or whether he was called to fight the fire at all. Once again construing the evidence most strongly in favor of the nonmovant Dailey, it might be decided that he was so ordered to work in a

dangerous place where Eaton knew he was substantially certain to be injured. Therefore, there is a genuine issue of material fact as to whether or not Dailey was required to fight the fire.

Having found error prejudicial to the appellant, Steven Dailey, the judgment of the Court of Common Pleas of Marion County granting summary judgment is reversed and remanded for further proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

SHAW and WALTERS, JJ., concur.