OPINION
{¶ 1} This is a timely appeal from an order entered by the Mahoning County Court of Common Pleas granting summary judgment in favor of Defendants-Appellees Senex Explosives, Inc. ("Senex") and Ensign-Bickford Company ("Ensign-Bickford") against Douglas S. Caldwell ("Appellant"). Appellant also challenges the trial court's previous order granting summary judgment in favor of Appellee Lafarge Corporation ("Lafarge"). After reviewing the record below, we conclude that genuine issues of material fact exist sufficient to preclude summary judgment in favor of Senex. In all other respects, the trial court's judgment is affirmed.
 {¶ 2} On January 16, 1998, while attempting to remove undetonated explosives from Petersburg Quarry in Youngstown, Appellant was struck by a boulder when it unexpectedly dislodged from the quarry wall. The rock rolled onto and crushed Appellant's right leg. Unable to save the leg, doctors eventually amputated it below the knee. Four months before this incident, the owners of the quarry at the time, Petersburg Stone Company ("Petersburg"), employed Senex to blast the site so Petersburg could meet customer demand for limestone. Appellant, one of several licensed blasters on Senex's payroll, helped to prepare and configure the explosives. Unfortunately, the explosives misfired.
 {¶ 3} The misfire occurred on August 21, 1997. Earlier that day, Appellant, in consultation with Senex President Alex Senules and several coworkers, prepared a blast pattern that appeared to fit the requirements of the job. (Cardillo Depo., pp. 17-19). The record indicates that the blasting job was more difficult than normal because there were residential dwellings located nearby. (Cardillo Depo., p. 44). Nevertheless, Petersburg needed the limestone blasted into pieces small enough to harvest, crush and otherwise prepare for consumers. (Senule Depo., p. 38). Also, Petersburg president Bill Catlett wanted the blast to force material away from a nearby drainage ditch he had created in the quarry's pit. (Caldwell Depo., p. 54). As a consequence, the blast needed to be carefully directed and powerful, but not so powerful that it "threw rock" into the drainage ditch or otherwise damaged or disturbed nearby property. (Senules Depo., pp. 36-38).
 {¶ 4} According to the record, the blast plan that Appellant eventually adopted involved three rows with nine or ten explosive holes per row. The holes were drilled to approximately seventeen feet deep. Explosives were then inserted into the holes along with an emulsion compound, primer and rock. The explosives were attached to blasting caps, which were wired together and linked to a single detonator. The detonator Appellant used on August 21, 1997, was manufactured by Ensign-Bickford. According to Appellant, because of the unique specifications of the blast, he detonated the middle row of explosives before the top and bottom rows. (Appellant's Depo., pp. 54, 56). After the middle row exploded, however, the surrounding rows misfired, with the top row of explosives collapsing over the bottom row. (Appellant's Depo., pp. 66-68). The misfire created a "muck" pile approximately twenty feet deep, composed of buried explosive material, shattered rock and other debris. (Appellant's Depo., pp. 195-198). Witnesses characterized the blast site as an extraordinarily dangerous "mess," and the worst misfire ever experienced by Senex. (Appellant's Depo., Vol. I, p. 45; Cardillo Depo., p. 40).
 {¶ 5} Appellant notified Cardillo and Senex president Senules about the misfire. Both men advised Appellant not to report the incident to the Ohio State Explosive Inspectors, the Mine Safety and Health Administration, or any other authoritative body. (Appellant's Depo., p. 69). While there is considerable dispute among the witnesses concerning whether such reporting is required for explosive misfires, more than one expert identified several state and federal regulations which appear to require that incidents of this nature should be reported. (Opinions of Vince Joyce, p. 7; Report of Andrew Sterner, p. 1).
 {¶ 6} Witnesses disagreed as to how the misfire occurred and who or what was at fault. According to Appellant, the misfire occurred because the blasting cap or detonator did not fire properly. (Appellant's Depo., p. 172). Senex president Senules believed that it was a mistake to blast the middle row first because such a blast could cause the surrounding rows to collapse. (Senules Depo., pp. 82, 86). Senules also testified at his deposition that Appellant or someone working with him on the blast might have failed to hook up the wires to the blasting caps properly. (Senules Depo., pp. 35-37). Fred Cardillo believed that Appellant had hooked up one of the "caps" wrong, and recalled that Appellant had admitted something to that effect when he reported the misfire. (Cardillo Depo., pp. 34-35).
 {¶ 7} Whatever the cause, it was Senex's job to clean it up. (Cardillo Depo., p. 54). Appellant could not recall the last time he had seen a misfire. (Appellant's Depo., pp. 180-181, 202). Apparently, the easiest way to deal with a misfire is to re-blast the area. (Senules Depo., p. 52). Unfortunately, that option was not available in this case. Thus, Senex needed to formulate a clean up plan. Because the explosives did not need to be extracted immediately, Senex waited a few months before beginning the task. According to Senules, the delay might cause exposure to moisture, sunlight, and other weather elements which could potentially desensitize the explosives and make their removal safer. (Senules Depo., pp. 55-57). Later, sometime that fall, Senex shot water into the site's blast holes, which forced some of the explosives to the surface for easier collection. (Senules Depo., p. 54).
 {¶ 8} Those efforts were not completely successful, however. In the end, the only way Senex could be sure that it had collected all of the explosives was to have an employee scan the debris as it was dug from the "muck" pile and painstakingly remove the explosive material one piece at a time. Because so much explosive material remained deeply embedded in the limestone, this was an arduous task. (Senules Depo., pp. 54-55). The work was also exceedingly dangerous because all of the stone and debris retrieved from the pile was promptly crushed, and any undetonated dynamite, blasting caps, primer, or powder not extracted could explode once introduced to the crusher. (Appellant's Depo., pp. 78, 195, 196).
 {¶ 9} Ultimately, the task of removing the explosive material from the misfire site fell to Appellant, who reluctantly began the assignment on January 14, 1998. Appellant advised Senex that he thought it was unsafe to be pulling undetonated explosives out of the pile as they were forcibly dislodged by a front-end loader. (Appellant's Depo., pp. 78-80). Appellant was further troubled that he lacked experience with such a task. Senex admits that Appellant registered with his employer his safety concerns about the misfire clean up. But according to Fred Cardillo, Appellant was, "never specifically told to be in the pit," as the explosives were removed, and that all he needed to do was prevent explosive material from going into the crusher. (Cardillo Depo., pp. 64-65). According to Appellant, though, there was no other way to see the explosives unless he was in the pit within ten feet of the front-end loader as it worked. (Appellant's Depo., Vol. I, p. 80).
 {¶ 10} Appellant sustained his injury in the late afternoon of January 16, 1998. During the previous two days, Senex sent other employees to work the site with Appellant. On the day of the accident, however, he was without backup. (Appellant's Depo., p. 81, 85). Somehow, while Appellant was hauling materials from the muck pit, a substantial boulder which was loosened either during the previous blast or by the front-end loader during the retrieval process, rolled onto his right leg and trapped the limb under its weight. Rescuers eventually removed the boulder and took Appellant to the hospital. As earlier stated, efforts to save the leg failed and doctors were forced to sever it below the knee.
 {¶ 11} On January 14, 2000, Appellant and his wife filed a complaint in the Mahoning County Court of Common Pleas alleging negligence and strict liability against both Petersburg and Lafarge as the owners of the quarry, since Petersburg sold the property to Lafarge in 1999. The complaint also alleged intentional tort against Senex, and products liability, negligence and breach of warranty against both Senex and Ensign-Bickford (the manufacturer of the blasting cap and detonators involved in the misfire). Due to failed service on Petersburg and its owners, the trial court dismissed Petersburg without prejudice on July 17, 2001. The record does not reflect that Appellant pursued further action against Petersburg.
 {¶ 12} On August 9, 2001, the trial court granted Lafarge's motion for summary judgment, concluding that there were no genuine issues of fact and that as a matter of law, Appellant could not recover against the company.
 {¶ 13} The remaining defendants then filed motions for summary judgment. On December 14, 2001, the trial court granted summary judgment in favor of the remaining defendants. With respect to Appellant's intentional tort claim against Senex, the court concluded that Appellant had failed to demonstrate a, "specific dangerous condition of the employer's making or within its knowledge," to support an employer intentional tort, opining that,
 {¶ 14} "Plaintiff's injury is analogous to a police officer suffering injury as a result of a confrontation with a violent criminal. When one undertakes to be the one in charge of a scene of known danger an injury flows from just those known dangers, it is not to be presumed that an intentional tort by the employer was the cause. A work place intentional tort is one suffered beyond the natural hazards of one's employment." (Judgment Entry, Dec. 14, 2001, p. 2).
 {¶ 15} The trial court went on to dispose of Appellant's products liability claim as follows:
 {¶ 16} "While Plaintiff has provided evidence by way of affidavit tending to show that alternate designs were available to the defendant, it is speculation whether another design could have prevented Plaintiff's injuries. It has not been opined that misfires could be avoided entirely by any alternate design." (Judgment Entry, Dec. 14, 2001, p. 2).
 {¶ 17} The court noted that even if Appellant could demonstrate the existence of a defect in an Ensign-Bickford product, he could not show that the defect caused or contributed to the accident that resulted in his injuries. The court concluded that in the absence of such evidence, Ensign-Bickford was entitled to judgment as a matter of law.
 {¶ 18} Appellant filed two Notices of Appeal (one from the summary judgment order of August 9, 2001, and the other from the Dec. 14, 2001, decision) on January 10, 2002. On January 28, 2002, this Court consolidated the matters under a single case number.
 {¶ 19} In his first assignment of error, Appellant maintains that,
 {¶ 20} "The trial court erred in granting appellee Senex's motion for summary judgment."
 {¶ 21} Appellant first argues that the trial court should have allowed the intentional tort claim against his employer to proceed to trial where there was a sufficient question of fact with respect to his allegations. Based on the record herein, we must agree with Appellant.
 {¶ 22} As an initial matter, there appears to be a conflict of law question as to whether Ohio or Pennsylvania law should govern this matter. Although Senex did raise this issue in the trial court, claiming that Pennsylvania law barred Appellant's intentional tort action, the trial court did not address the claim explicitly. While one might conclude that implicitly, at least, the court appears to have rejected this claim by failing to address it, given the fact that we must remand the matter the court will undoubtedly be forced to revisit this issue. Under Pennsylvania law employers are immune from intentional torts. SeePoyser v. Newman Co., Inc. (1987), 514 Pa. 32, 522 A.2d 548. If the trial court finds that Pennsylvania law controls, then Appellant's intentional tort action against Senex would necessarily fail.
 {¶ 23} Choice of law principles are not applied unless there is a conflict between the laws of the respective states that are involved. Since it does appear, given the Pennsylvania Supreme Court's interpretation of that state's workers compensation law in Poyser, that Ohio and Pennsylvania law are conflicted, choice of law analysis must be addressed in this case. When faced with a choice of law question, it is presumed that the law of the place of injury controls unless another jurisdiction has a more significant relationship to the lawsuit. Morganv. Biro Mfg. Co. (1984), 15 Ohio St.3d 339, 474 N.E.2d 286.
 {¶ 24} The trial court determines choice of law based on the following factors: (1) the place of injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any is located; and (5) any factors under the Restatement of Law 2d, Conflict of Laws 10, which the court deems relevant to the litigation. In the absence of a statutory directive from the state wherein the court is applying the conflict rules, the Restatement identifies the following factors as relevant:
 {¶ 25} "a) the needs of the interstate and international systems,
 {¶ 26} "b) the relevant policies of the forum,
 {¶ 27} "c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 {¶ 28} "d) the protection of justified expectations,
 {¶ 29} "e) the basic policies underlying the particular field of law,
 {¶ 30} "f) certainty, predictability, and uniformity of result, and
 {¶ 31} "g) ease in the determination and application of law to be applied." Morgan, supra at 342; quoting 1 Restatement of Law 2d, Conflict of Laws 10.
 {¶ 32} There are significant factors that link this case to Pennsylvania. Both Appellant and Senex live or are based there. Moreover, Appellant received his workers compensation benefits from Pennsylvania. On the other hand, the accident occurred in Ohio, while Appellant was physically working in Ohio. Because this matter was insufficiently addressed by the parties below, leaving the record before us somewhat sparse, this issue will become a matter for the trial court to resolve on remand.
 {¶ 33} As for the trial court's decision to resolve this matter by way of summary judgment, we note that this is proper only when the trial court determines that: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to only one conclusion, and viewing the evidence most strongly in favor of the non-movant, the conclusion is adverse to that party. Gross v.Fizet (December 18, 2001), 7th Dist. No. 00-C.A.-250, at *7; quoting,Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 267; and Civ.R. 56.
 {¶ 34} The party seeking summary judgment must provide the basis for its motion and identify the parts of the record that demonstrate it is entitled to judgment as a matter of law. Vahila v. Hall (1997),77 Ohio St.3d 421, 674 N.E.2d 1164; quoting Dresher v. Burt (1996),75 Ohio St.3d 280, 293, 662 N.E.2d 264. The movant must also point out the evidence tending to show that no genuine issue of material fact exists with respect to the essential elements of the opposing party's claim. Dresher, at 293.
 {¶ 35} Where the initial burden is met, the responding party must then counter by demonstrating that there exist genuine issues for trial.Lovejoy v. Westfield Natl. Ins. Co. (1996), 116 Ohio App.3d 470, 474,688 N.E.2d 563. To withstand summary judgment, the opposing party must specify facts supporting the elements of the claim it expects to prove.Dresher, at 293. The trial court looks at this information in a light most favorable to the party opposing summary judgment. Civ.R. 56(C). Only when this examination reveals no disputed factual issues is summary judgment proper. Nice v. Marysville (1992), 82 Ohio App.3d 109, 116-117,611 N.E.2d 468.
 {¶ 36} An appellate court subjects a trial court's decision to grant summary judgment to non-deferential, de novo review. Wilson v.Lafferty Volunteer Fire Dept. (Nov. 29, 2001), 7th Dist. No. OO BA 29, at *6; quoting Brown v. Scioto Bd. of Commrs. (1993), 87 Ohio App.3d 704,711, 622 N.E.2d 1153. In determining whether a case is properly resolved by way of summary judgment, neither the reviewing court nor the trial court is entitled to, "weigh the evidence presented or choose among reasonable factual inferences in deciding whether summary judgment should be granted." Wilson, at *7, quoting Perez v. Scripps-Howard BroadcastingCo. (1988), 35 Ohio St.3d 215, 218, 520 N.E.2d 198.
 {¶ 37} Appellant alleged that his employer, Senex, is liable for the injury he suffered while attempting to remove the misfired explosives at Petersburg Quarry on January 16, 1998. Although Ohio workers' compensation provisions provide employees with the primary means of compensation for injury suffered in the scope of employment, our Supreme Court has recognized a common law cause of action by an employee against the employer when the employer's conduct is sufficiently egregious to constitute an intentional tort. Hannah v. Dayton Power Light Co.
(1998), 82 Ohio St.3d 482, 484, 696 N.E.2d 1044. Such conduct is considered as occurring outside the scope of the employment and, necessarily, beyond the bounds of the worker's compensation act.Blankenship v. Cincinnati Milacron Chemicals, Inc. (1982),69 Ohio St.2d 608, 433 N.E.2d 572.
 {¶ 38} An employee can prevail in an intentional tort against his employer if he demonstrates, (1) that the employer had actual or constructive knowledge that a dangerous process, instrumentality or condition existed at the workplace; (2) that the employer knew that if the employee were subjected by his employment to such a danger he was substantially certain to sustain harm; and 3) that despite such knowledge, the employer required the employee to perform the dangerous task or work under that dangerous condition. Dailey v. Eaton (2000),138 Ohio App.3d 575, 581, 741 N.E.2d 946; citing, Fyffe v. Jeno's, Inc.
(1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph five of the syllabus. Considering the record in a light most favorable to Appellant, the record reflects that there are disputed questions of fact sufficient to withstand summary judgment as to the intentional tort claim.
 {¶ 39} Knowledge of Dangerous Condition
 {¶ 40} To satisfy the first element of employer intentional tort, Appellant must show that a dangerous condition existed and Senex knew about the danger. In looking at this issue we must note that work that is considered generally dangerous must be distinguished from an otherwisedangerous condition which arises within that work. An employer will onlybe held, here, when a danger above and beyond the ordinary for hisemployment is present. Naragon v. Dayton Power Light Co. (Mar. 30,1998), 3rd Dist. No. 17-97-21; citing Brady v. Safety-Kleen (1991),61 Ohio St.3d 624, 631, 576 N.E.2d 722. Injuries that occur in the scope of employment, by definition, are not intentional torts. "A workplace intentional tort is one suffered outside the scope of employment, beyond the `natural hazards' of one's employment. Were it otherwise, any injury associated with inherently dangerous work," like high voltage electrical work or, as in this case, work involving explosives, "could subject an employer to intentional tort liability, whatever the cause." Naragon at 7.
 {¶ 41} To determine whether the employer had knowledge of the dangerous condition or procedure, a court must determine the extent of the employer's actual knowledge of the danger. Fultz v. Baja Boats, Inc.
(Feb. 18, 1994), 3rd Dist. No. 3-93-10. However, the "reasonable person" standard for determining negligence or recklessness is not used in this process. The fact that the employer might or should have known that if it required the employee to work under dangerous conditions the employee would certainly be injured is not enough to establish a case for intentional tort. Rather, the determination turns on whether the plaintiff alleges facts showing the employer possessed actual or constructive knowledge of the dangerous situation.
 {¶ 42} When it granted Senex's motion for summary judgment, the trial court had before it discovery deposition testimony from a multitude of occurrence and post-occurrence witnesses. The parties also consulted with numerous experts who offered a range of opinions in the form of testimony and reports on various aspects of this case. For example, after reviewing much of the evidence elicited during discovery, one of Appellant's experts, Andrew Sterner, a mining and explosives consultant, summarized his findings with respect to Senex's liability as follows:
 {¶ 43} "[I]t is clear that clearing this muck pile was all Appellee Senex Petersburg Stone were concerned with, to make room for the next shot and to fill stone orders. They had 4 months to properly notify state and local authorities, but never did. To send Mr. Caldwell into such a dangerous situation, plus the quarry walls were loose and rock was falling, and without a helper is clearly an unsafe practice, and the blasting community condems (sic) these acts." (Preliminary Report of Andrew P. Sterner, May 31, 2001).
 {¶ 44} Similarly, after discussing various specifics about the case, Vince Joyce, a mining engineer Appellant consulted, generally opined that:
 {¶ 45} "[A]t the time of Mr. Caldwell's injury, there were a number of specific unsafe working conditions that existed in the work place that presented a high degree of risk and a strong probability of serious injury or death to Mr. Caldwell. Additionally, these specific unsafe working conditions were a violation of a state or federal statute, rule, or regulation, or of a commonly accepted and well known safety standard within the mining industry. In my opinion, the unsafe working conditions that existed caused serious injuries to Mr. Caldwell and are a result of the negligent acts of Petersburg Stone and Appellee Senex." (Opinions of Vince Joyce, May 2001, p. 4).
 {¶ 46} On the other hand, Ensign-Bickford detonation expert Klaus Rucker concluded that:
 {¶ 47} "[Appellant's] accident could have been avoided if he had used a broomstick or loading pole to probe the rock pile. A precariously supported rock slab would safely be dislodged this way. Also he could have asked the operator of the front-end-loader to pat down the pile . . ." Rucker also stated, "I am fully convinced that Mr. Caldwell could have avoided the crushed leg by proper inspection of the muck pile. There was ample time to do so." (Report of Klaus Rucker, July 30, 2001).
 {¶ 48} Senex has maintained that Appellant made a mistake by entering the muck pile to remove explosives without a lookout or backup on the day of the accident. (Senex Motion for Summary Judgment, p. 5). Nevertheless, Senex president Alex Senules testified that in his experience there really was no other way to remove the material from a misfire site. (Senules Depo., p. 62). The fact that Senex opted not to report the misfire to local authorities also involves a factual dispute. Although Senules and Cardillo both deny that they were required to report the misfire, consulting experts in this case detail a laundry list of state and federal codes that Senex violated when it failed to report the incident, largely because of the dangers such a misfire presents.
 {¶ 49} The record indicates that more than a ton of explosives were used in the failed blast. The explosives that detonated may have weakened or cracked the surrounding limestone while simultaneously burying potentially volatile explosives, turning the quarry into an unstable minefield. Senex's insistence to the contrary, Appellant contends that state and federal involvement in and oversight of the blast area and subsequent clean up would surely have improved the site's safety. As the parties readily concede, misfires are infrequent. Appellant claims the failure to report is a material factual issue because input from individuals more familiar with such occurrences might have prevented Appellant's permanently debilitating injury.
 {¶ 50} No one disputes that Appellant was employed to work with explosives and that such employment presents an inherently dangerous condition. Certainly, this clean up involved the real possibility that one of the misfired explosives could now explode. Appellant was injured, not by an explosion, but by an incident which occurred as a direct result of other dangers presented by the site, itself. Viewed in a light most favorable to Appellant, the record indicates that reasonable minds could determine that the site of the misfire at Petersburg Quarry and the clean up plan formulated presented a "dangerous condition" as that term is understood in the context of employer intentional torts above and beyond the hazards inherent in Appellant's work. Further, no witness disputes that Senex knew of the dangerous condition that existed at the time. We find, therefore, that Appellant has satisfied the first prong necessary to maintain an intentional tort, at least to the extent necessary to withstand summary judgment on the issue.
 {¶ 51} Injury is Substantially Certain
 {¶ 52} The second element one claiming an employer intentional tort must prove is that the employer knew the employee's exposure to the dangerous condition was substantially certain to cause harm. Fyffe at paragraph one of the syllabus. Substantial certainty is more than an employer's mere knowledge that such a condition presented a high risk of harm or danger. Cope v. Salem Tire, Inc., 7th Dist. No. 2001 CO 10,2002-Ohio-1542. Appellant need not demonstrate that the employer actually intended that the harm occur. Van Fossen v. Babcock Wilcox Co.
(1988), 36 Ohio St.3d 100, 117, 522 N.E.2d 489. As the probability or likelihood of harm increases, and the employer knows that injury to an employee is certain or substantially certain to result from a particular activity, the law treats the employer as if he intended to cause the harm if the employer proceeds with the activity despite such knowledge.Brookover v. Flexmag Industries, Inc., 4th Dist. No. 00CA49,2002-Ohio-2404.
 {¶ 53} This Court has previously held that an employee was substantially certain to sustain injury where she was forced to work under hectic conditions around a machine that the employer knew frequently operated without a safety guard. Jackson v. Astro Shapes,Inc. (Feb. 29, 2000), 7th Dist. No. 98 CA 179. In contrast, another reviewing court affirmed summary judgment in Hartley v. Marion Steel Co.(Oct. 4, 1996), 3rd Dist. No. 9-96-30, where the employee was killed during an explosion caused by a molten steel spill. In Hartley, however, the spill occurred even though the employer had established safety procedures for the transportation of molten steel. During the unexpected accident, a cradle transporting molten steel broke and the steel exploded. The court reasoned that because the employer had established and followed its safety plan, "Appellee appreciated the risk that molten steel or other objects falling several feet onto employees would be dangerous, and attempted to avoid this type of accident. The decedent was not hit by molten steel." Hartley at 4.
 {¶ 54} In the instant case, unlike the employer in Hartley, Senex had no established safety plan within the clean up operations, nor did it contact the authorities to determine if one were necessary to protect employees from injury during the extraction process. When Appellant objected to the assignment, Dispatcher Fred Cardillo responded as follows;
 {¶ 55} "Doug, the only thing you have to do is prevent those explosives from going into that crusher. You don't have to go into the pit. I said have them dig them out and dump the material on the ground like we were doing. I never specifically told Doug to go down in the pit." (Cardillo Depo., p. 65).
 {¶ 56} The record reflects that Senex was rushing to complete the misfire clean up. After neglecting the mess for several months, Senex spent three days in a row at the site removing the undetonated material. Petersburg was in the process of selling the quarry to Lafarge and could not complete the transfer of the property while the undetonated explosives remained embedded in the quarry. (Senules Depo., pp. 57-58). Appellant complained that the job was not being done safely. According to Appellant, they should have taken more time on the job, "digging more slowly and not taking the rock straight up to the crusher. I thought they would have a place where they could dump it and then we could look at it in that area, but that's not how they set it up. They set it up to spade the rock out and take it straight to the crusher. They wanted the rock to crush. They must have had an order and they wanted that rock. We had four months to look at it and they didn't look at it. They didn't send anybody up to go look at the problem." (Appellant's Depo., p. 86).
 {¶ 57} Even though Appellant shared these concerns with Cardillo, his dispatcher (who described Appellant as a "whiner" and chronic complainer) they were disregarded. (Cardillo Depo., p. 63). Moreover, on the day Appellant sustained his injury, Cardillo sent him to the job site without an assistant to provide the very backup that Appellee now maintains Appellant ought to have relied upon.
 {¶ 58} While the evidence presented is less than overwhelming, there does appear to be a genuine issue of material fact as to whether Appellant's injury was substantially certain to occur as that term is understood in regards to employer intentional tort.
 {¶ 59} Requirement that the employee perform the dangerous work
 {¶ 60} The third and final element essential for sustaining a claim of an employer intentional tort requires proof that the employee was given no choice but to perform the dangerous task. Appellant's deposition, as well as that of Senex dispatcher Fred Cardillo, confirms that he legitimately believed that Senex required him to undertake the difficult task of removing the undetonated explosives. While no one directly told Appellant his refusal would result in termination, Cardillo's message was clear when he said, "this is what you have been scheduled to do, Doug." (Appellant's Depo., p. 85). Certainly, such testimony created enough of a factual dispute to preclude summary judgment with respect to the claim against Senex.
 {¶ 61} Accordingly, Appellant has presented sufficient evidence to raise questions of material fact at least to the extent to withstand summary judgment on his intentional tort claim against his employer, Senex.
 {¶ 62} In his second assignment of error Appellant contends that,
 {¶ 63} "The trial court erred in granting appellee Ensign Bickford Company's motion for summary judgment"
 {¶ 64} Appellant sought to recover against Ensign-Bickford under two products liability theories, one alleging defective design and the other a failure to warn. According to Appellant, a defect in the design of the company's blasting caps was the direct and proximate cause of the injury that eventually caused him to lose his leg. Appellant alternatively maintains that had Ensign-Bickford warned him about the "propensity" of their blasting caps to misfire and provided instructions on how to safely deal with a misfired system, the accident could have been prevented. (Appellant's Brf. p. 31). Unfortunately, the record establishes no evidence beyond mere allegation to support such claims.
 {¶ 65} R.C. 2307.75 allows a plaintiff to proceed against a manufacturer of an allegedly defective product based on consumer expectation or a risk benefit standard. Under the circumstances, a manufacturer will be held liable where a plaintiff demonstrates that the product is defective in design or formulation if: (1) the foreseeable risks associated with its design or formulation exceed the benefits, or (2) it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. R.C. 2307.75(A)(1)-(2).
 {¶ 66} The risk-benefit analysis requires plaintiffs to prove only that the design risks outweigh the benefits, not that a product is "unreasonably dangerous." Perkins v. Wilkinson Sword, Inc. (1998),83 Ohio St.3d 507, 512, 700 N.E.2d 1247; and State Farm Fire Cas.v. Chrysler (1988), 37 Ohio St.3d 1, 7, 523 N.E.2d 489. Under the risk-benefit analysis, foreseeable risks are determined in light of the following:
 {¶ 67} "(1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
 {¶ 68} "(2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;
 {¶ 69} "(3) The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
 {¶ 70} "(4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer." R.C.2307.75(B).
 {¶ 71} These risks, however, must be weighed against the following benefits associated with the products design:
 {¶ 72} "(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;
 {¶ 73} "(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;
 {¶ 74} "(3) The nature and magnitude of any foreseeable risks associated with such an alternative design or formulation." R.C.2307.75(C).
 {¶ 75} The Ohio Supreme Court has stressed that the risk benefit and the consumer expectation analyses are not mutually exclusive. Rather, they, "constitute a single, two-pronged test for determining whether a product is defectively designed. . . . [A] product may be found defective in design even if it satisfies ordinary consumer expectations if the jury determines that the product's design embodies excessive preventable danger. In other words, if the jury concludes that one standard is not met, the jury may consider the other standard." Perkins, supra at 1248.
 {¶ 76} Nevertheless, the statute provides an exception where the evidence demonstrates that, "* * * at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce." R.C. § 2307.75(F).
 {¶ 77} Under R.C. 2307.76, a product is defective due to an inadequate warning or instruction if, when it left the control of its manufacturer, "[t]he manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages; [and] [t]he manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm." R.C. 2307.76(1)(A) and (B); and D'Agastino v.Uniroyal-Goodrich Tire Co. (1998), 129 Ohio App.3d 281, 284, 717 N.E.2d 781.
 {¶ 78} A product may also be defective due to a failure to provide post-marketing warning or instruction after leaving the manufacture's control if the following occurred:
 {¶ 79} "(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 80} "(b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm." R.C. 2307.76(2)(a) and (b).
 {¶ 81} Where the risk accompanying a product's use is open and obvious or a matter of common knowledge, however, the product will not be treated as defective due to the manufacturer's failure to include warning or instruction addressing such a risk. R.C. 2307.76(B); see, also,Schremp v. Hough's Products (Nov. 19, 1997), 9th Dist. No. 97CA6655 (no defect in failing to warn of dangers inherent in diving into shallow pool).
 {¶ 82} First and foremost, Appellant must identify by use of some evidence the defect in the product. In this case, Appellant has not provided evidence to create a factual dispute that the Ensign-Bickford detonator or blasting cap was defective under any of the available products liability theories. The best that can be said for the evidence presented here is that it is both vague and unsubstantiated. At his deposition, Appellant maintained that the misfire occurred because Ensign-Bickford's blasting cap, "fired but didn't initiate the next cap in the series." (Appellant's Depo., p. 172). Appellant further indicated that he had had difficulty with Ensign-Bickford's products generally within the five years that preceded the misfire. (Appellant's Depo., pp. 38-39). Senules also indicated that Senex had experienced difficulties with Ensign-Bickford products. His testimony on the subject was as follows:
 {¶ 83} "Well, we've had some [problems] with the shock tube broke easily on boosters and your boosters would fall off down the hole. So we had some brittleness of shock tube. Detonators that weren't attached to the shock tube fell off the end due to poor crimping. And we had one that down in Virginia we had some misfires on dets that had shock tube problems and didn't propagate properly." (Senules Depo., p. 40).
 {¶ 84} Appellant also presented the statement of his expert, Samuel Sero, that, as the manufacturer of this super hazardous product, Ensign-Bickford should have corrected the blasting cap's design so that the misfire could not recur. (Sero Depo., Sero Report, June 19, 2001). There is absolutely nothing in Sero's deposition or report to support this conclusion and his conclusion appears to rest on mere assumption that the product's design was in some way defective. The record contains no evidence supporting the existence of a defect. Appellant does not even venture to identify any defect, and so cannot identify Ensign-Bickford's failure to warn of defect. Moreover, since no party sent any of the spent or unspent material from the August 21, 1997, misfire to Ensign-Bickford or an expert in the manufacturing of explosives for analysis (Senules Depo., p. 73), Appellant merely speculates as to the cause of the misfired explosion. As stated earlier in this Opinion, Senex president and another employee offered several other possibilities as to the cause of the misfire which did not involve the idea that Ensign-Brickford's product was in any way defective. (Senules Depo., pp. 35-37, 82, 86; Cardillo Depo., pp. 34-35). Unless Appellant has some evidence of defect, his assumptions and speculation alone do not create an issue of fact sufficient to send this matter to trial.
 {¶ 85} Appellant must present actual evidence of defect in the product, not assumptions. There is absolutely no evidence by way of expert opinion or otherwise to show that the product produced by Ensign-Brickford (as opposed to any component part of this explosive, which were produced by various other manufacturers or Appellant's own error in setting up the explosives) was defective. Mere failure to explode is not enough, particularly where no expert in the field opines that, in every case, a non-defective explosive will always explode and no one has ruled out human error or any other possible cause of the misfire. Appellant has provided the record with mere supposition on this issue.
 {¶ 86} Summary judgment in favor of Ensign Brickford, was also proper for the reason that proximate causation could not be established. The failure to detonate all explosives due to an alleged defect in the design of the company's blasting caps and failure to warn could not be the proximate cause of Appellant's injuries.
 {¶ 87} Appellant was injured some four months after the incident during the cleanup of the rubble pile created by the blasting pattern that involved several misfires. The injuries occurred from a chain of events that were separate and independent from the actual use of the blasting caps. While proximate cause is normally reserved for the jury to determine, the absence of any evidence to support proximate cause precludes the establishment of a genuine issue of material fact as to Ensign-Brickford's liability.
 {¶ 88} Accordingly, this Court has no reason to disturb the trial court's decision to grant summary judgment against Appellant with respect to his claim against Ensign-Bickford.
 {¶ 89} In his third assignment of error Appellant complains as follows:
 {¶ 90} "The trial court erred in granting appellee Lafarge Corporation's motion for summary judgment."
 {¶ 91} According to Appellant, when Lafarge purchased the quarry from Petersburg it became responsible for Petersburg's liabilities as well as its assets. Since the purchase agreement for the property does not explicitly include such a provision, Appellant proposes that this Court ought to find such a term is implied in the agreement. Alternatively, Appellant maintains that since Lafarge purchased, not just the quarry, but Petersburg's entire business, under an expanded view of the "mere continuation" theory Lafarge should be liable. Appellant is mistaken in these theories.
 {¶ 92} When a corporation purchases the assets of another corporation it is not liable for injury caused by its predecessor corporation except under the following circumstances: "(1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." Flaugher v. Cone Automatic Machine Co. (1987), 30 Ohio St.3d 60,62, 507 N.E.2d 331; (Emphasis in original) reiterated in WelcoIndustries, Inc. v. Applied Cos. (1993), 67 Ohio St.3d 344, 617 N.E.2d 1129.
 {¶ 93} Appellant maintains that that Lafarge is liable either because it impliedly agreed to assume Petersburg's liabilities when it purchased the quarry or because the Lafarge operation is merely a continuation of Petersburg's business. Even when reviewed in a light most favorable to Appellant, the record in this case fails to demonstrate that Lafarge is liable under either exception. To the contrary, as the following passage from the Asset Purchase Agreement demonstrates, Lafarge explicitly refused to assume such liability:
 {¶ 94} "2.3 Assumed Liabilities. Buyer shall not assume any liability or obligation of any of the Seller and/or Owners, or any other person, except for the Assumed Liabilities identified on Schedule 5.5 (`Assumed Liabilities').
 {¶ 95} "Schedule 5.5
 {¶ 96} "Seller/Owner's Liabilities to be Assumed by Buyer
 {¶ 97} "-None-" (See Ex. A — Appellee Lafarge's Motion for Summary Judgment, June 28, 2001).
 {¶ 98} Nevertheless, Appellant insists that the contract was ambiguous with respect to Lafarge's assumption of liabilities and therefore summary judgment was improper. Appellant directs this Court to section 10.4 of the agreement, which reads:
 {¶ 99} "Post Closing Matters. The parties agree to provide for certain activities after the Closing Date as follows:
 {¶ 100} "(a) Buyers and Sellers will cooperate with each other in connection with:
 {¶ 101} "(i) Any claim or litigation made or instituted against Buyer, Seller, or Owners in respect of the past and future operations of the Purchased Assets, which cooperation shall include, but not be limited to, making available then-employees of Buyer, Sellers, or Owners, as the case may be, for the purpose of providing technical or expert testimony and advice." (See Ex. A — Appellee Lafarge's Motion for Summary Judgment, June 28, 2001).
 {¶ 102} The above referenced promise of cooperation in the event of litigation, however, hardly renders the liability provision of the contract ambiguous. According to Lafarge's comptroller, Chris Beeman, Lafarge was not aware of any pending litigation at the time it agreed to purchase the quarry. (Beeman Depo., p. 34). Further, the agreement reflects no reduced price or other consideration one would expect to see had Lafarge opted to assume Petersburg's liabilities. In the absence of any evidence undermining the clarity of the assumption of liability portion of the contract for the quarry's sale, Appellant cannot credibly argue that the contract is ambiguous.
 {¶ 103} Nor will Appellant prevail on his argument that Lafarge assumed Petersburg's liabilities because it is a continuation of Petersburg's business. Our Supreme Court has stressed that in determining whether the mere continuation exception applies we should focus on whether there is a continuation of the corporate entity, not just the operation of the business. Flaugher, supra at p. 64. A corporate entity continues when one corporation sells its assets to another corporation, but the same persons or entities own or control both corporations. Accordingly, as the Supreme Court noted in Welco, supra, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. Id. at 354.
 {¶ 104} In the instant case, while the two businesses both seek to mine the quarry's limestone and do share similarities, they are plainly different corporate entities. Based on the record before us, the trial court made the correct decision when it granted summary in favor of Lafarge Corporation.
 {¶ 105} Based on the foregoing opinion, the decision entered by the Mahoning County Court of Common Pleas is hereby affirmed in part, reversed in part and remanded for further proceedings in accordance with law and consistent with this Opinion.
Donofrio and Vukovich, JJ., concur.