**KERG, Appellant,**

v.

**ATLANTIC TOOL AND DIE COMPANY et al., Appellees.**

[Cite as *Kerg v. Atlantic Tool & Die Co.*, 176 Ohio App.3d 437, 2008-Ohio-2364.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 89776.

Decided May 15, 2008.

438

440

Nurenberg, Paris, Heller & McCarthy, Thomas Mester, Jonathan D. Mester, and Kathleen J. St. John, for appellant.

Gallagher Sharp, Thomas J. Cabral, and Colleen A. Mountcastle, for appellee Atlantic Tool & Die Co.

Bryan Cave L.L.P., R. Bruce Duffield, and Derek Holland; Squire, Sanders & Dempsey L.L.P., Stephanie E. Niehaus, and Robin G. Weaver, for appellee Littell International.

MARY EILEEN KILBANE, Judge.

{¶ 1} Plaintiff-appellant Marie Kerg appeals the lower court's ruling on defendants-appellees Atlantic Tool & Die Company's ("Atlantic") and Littell International's ("Littell") motions for summary judgment. For the following reasons, we affirm in part, reverse in part, and remand.

{¶ 2} On October 5, 2005, Kerg filed a complaint (later amended on December 23, 2005) against Atlantic, alleging employer intentional tort against Littell and Minster Machine Company for product liability and negligence.

{¶ 3} In December 2006, Atlantic and Littell filed separate motions for summary judgment. On March 29, 2007, the trial court granted both motions for summary judgment.

{¶ 4} Kerg began her employment with Atlantic in 2000 in its welding department. Sometime in 2001, Kerg was promoted to a secondary press operator, earning $9.40 per hour. On November 17, 2003, Kerg was again promoted and began her on-the-job training for her new position as an automatic press operator, earning $9.87 per hour. Kerg trained under Kin Ho, an experienced automatic press operator, and Leonardo D'Larosa, an experienced forklift operator.

{¶ 5} The forklift operator's responsibility begins by transporting a 2,200 pound, five-foot steel coil on a forklift to an "Advantage 6000" Littell single centering reel with electric brake ("Littell reel"). The forklift operator then places the coil onto a loose mandrel on the Littell reel. Thereafter, the automatic

press operator is responsible for placing "keepers" on the coil in order to keep the coil stabilized. In the meantime, the forklift operator keeps the coil on the lift as high as possible, so that the automatic press operator can then tighten the mandrel onto the coil. The forklift operator then removes the forklift, and the automatic press operator finishes the loading process with a front manual crank.

{¶ 6} The facts giving rise to the instant action occurred on December 29, 2003, when Kerg worked the night shift at Atlantic and operated a Littell reel as an automatic press operator. Kerg had just returned from her holiday vacation and was still deemed a "trainee." The shift supervisor, Ron Fowler, was aware that Kerg was "a little slower than most" in regard to her training.

{¶ 7} During that shift, Atlantic was understaffed because of the holidays, and neither D'Larosa nor Ho was present. Fowler assigned Kevin Kattas to work as a forklift operator alongside Kerg. Kattas had a license to operate a forklift but operated one very infrequently at Atlantic, approximately five to ten times a year, whenever he was needed.

{¶ 8} On December 29, 2003, Kattas transported a coil to Kerg's Littell reel and laid the coil on the mandrel. At this point, the forks on the forklift jerked. Kerg reached for the front manual crank with her right hand to make adjustments, having forgotten to put the keepers in place prior to making the adjustments. As Kerg was reaching for the crank, the coil fell, crushing part of her right hand.

{¶ 9} Kerg had performed this procedure independently two to three times in the weeks before she was injured. Kerg participated in only one of 12 required video training sessions and completed the applicable written exam. Kerg had not yet completed the remaining 11 lessons. Her time cards from November 17, 2003, to December 29, 2003, stated "in training" regarding her new position at Atlantic.

{¶ 10} On April 27, 2007, Kerg filed the instant appeal asserting two assignments of error for our review.

I. The trial court erred in granting summary judgment to defendant-appellee Atlantic Tool & Die Company on plaintiff's claim against it for employer intentional tort.

II. The trial court erred in granting summary judgment to defendant-appellee Littell International, Inc. on plaintiff's product liability claim.

{¶ 11} We review motions for summary judgment de novo and thus:

[W]e afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled

to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion, which is adverse to the non-moving party.

(Citations omitted.) *Ladanyi v. Crookes & Hanson Ltd.,* Cuyahoga App. No. 87888, 2007-Ohio-540, 2007 WL 416926, ¶ 10.

{¶ 12} The moving party "bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264. Conversely, the nonmoving party bears the reciprocal burden of setting forth those facts that show that there is a genuine issue of material fact. Id. at 296, 662 N.E.2d 264.

{¶ 13} With the standard of review for motions for summary judgment established, we review Kerg's two assignments of error.

Assignment of Error Number One

{¶ 14} Kerg argues that the trial court erred in granting summary judgment in favor of Atlantic on her employer intentional tort claim. We agree.

In Ohio, an employee generally must rely on the worker's compensation system to be compensated for job-related injuries, and does not need to sue the employer in tort in order to be compensated. However, an employee may also enforce his common-law rights against his employer if the injury stems from an intentional tort. An intentional tort in this context means that the employer committed some act by which the employer intentionally and deliberately injures the employee.

(Citations omitted.) *Moore v. Ohio Valley Coal Co.,* 7th Dist. No. 05 BE 3, 2007-Ohio-1123, 2007 WL 755386, ¶ 17.

{¶ 15} The Ohio Supreme Court, in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, set forth the standard for an employer intentional tort claim arising before April 7, 2005: [1]

[I]n order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated:

(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;

---

1. For causes of action arising after April 7, 2005, R.C. 2745.01 applies.

(2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and

(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

Id. at 118, 570 N.E.2d 1108.

{¶ 16} *Fyffe* also held: "[M]ere knowledge and appreciation of a risk—something short of substantial certainty—is not intent." Id.

{¶ 17} In applying the facts to the first prong of *Fyffe*, we note that the hazard must rise above the general hazards of the employment because otherwise the injury would be treated under workers' compensation. *Moore*, 2007-Ohio-1123, 2007 WL 755386 at ¶ 26. Thus, in order to satisfy the first prong in *Fyffe*, Kerg must satisfy the following two elements: "(1) there was a dangerous condition and (2) * * * [the employer] had knowledge that that dangerous condition existed." *Dailey v. Eaton Corp.* (2000), 138 Ohio App.3d 575, 741 N.E.2d 946.

In determining whether the condition or procedure was indeed dangerous this court cautioned: Dangerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach.

(Citations omitted.) Id. at 582, 741 N.E.2d 946.

{¶ 18} Atlantic knew that automatic press operators were subject to dangerous work, namely, loading a 2,200 pound coil onto a Littell reel. However, at issue is whether Atlantic knew that Kerg was subjected to an otherwise dangerous condition in the workplace. After reviewing the record, we agree with Kerg that there are sufficient facts demonstrating Atlantic's actual knowledge of a dangerous condition, namely, the following: assigning Kerg, a trainee, to work independently on a Littell reel; and assigning Kattas to Kerg as a forklift operator for the December 29, 2003 shift. Kattas operated a forklift only approximately five to ten times per year, and when loading coils, he loaded only approximately three coils per shift.

{¶ 19} Atlantic required automatic press operators to attend 12 training sessions in which the trainee watched a video and, thereafter, completed a written exam. The trainee was also provided a training manual and assigned to an experienced automatic press operator. The trainee first shadowed the trainer. The trainee was later supervised while executing the assigned tasks and eventually worked independently of the trainer. Training lasted anywhere from a few weeks to six months, depending upon the trainee's prior experience and ability to learn. Part five of Atlantic's safety manual, "Equipment Safety," reads: "No

associate is allowed to operate equipment on which they have not been trained to operate safely and properly."

{¶ 20} By December 29, 2003, Kerg had attended only one training class and had completed only one of the 12 written examinations regarding training for the automatic press operator position. The initial training class does not address loading coils onto the Littell reel. Furthermore, Kerg had executed the task of loading a coil onto a Littell reel only two or three times on her own. Kerg was still designated a "trainee" by Atlantic, as evidenced by her time card. Fowler knew Kerg to be "a little slower than most" regarding her progress while training.

{¶ 21} Atlantic was understaffed as a result of the holiday season. Ho and D'Larosa were not present to oversee Kerg's training. Kerg had just returned from her holiday vacation and could not even recall which buttons to push on the machine to begin the start-up sequence. Despite these facts and circumstances, Fowler assigned Kerg to independently operate a Littell reel.

{¶ 22} Furthermore, on December 29, 2003, Fowler assigned Kattas as a forklift operator to assist Kerg. Although Kattas was a licensed forklift operator, he worked on a forklift only five to ten times per year at Atlantic, on an as-needed basis. Despite Kattas's infrequent operation of the forklift, Fowler assigned Kattas to assist Kerg. When D'Larosa worked as a forklift operator, he always reminded Kerg to put the keepers on the mandrel to hold the coil in place. However, it does not appear that Kattas ever reminded Kerg to place the keepers on the mandrel on December 29, 2003.

{¶ 23} Atlantic knew about Kerg's inexperience because Atlantic was responsible for tracking her training and ensuring that she completed her training. Atlantic also knew about Kattas's infrequent operation of forklifts because Kattas's job responsibilities did not include operation of a forklift on a regular basis. Thus, there exist genuine issues of material fact regarding the first element of *Fyffe*. The second element of *Fyffe* requires Atlantic's knowledge that if Kerg were subjected to the Littell reel, harm to her would be a substantial certainty.

{¶ 24} Inadequate training is a relevant factor that supports a finding that Atlantic knew to a substantial certainty that harm would occur. *Page v. Taylor Lumber, Inc.*, 161 Ohio App.3d 644, 2005-Ohio-3104, 831 N.E.2d 1017.

{¶ 25} Kerg's expert witness, Donald Kadunc, Ph.D., P.E., after reviewing the record, concluded:

Atlantic Tool & Die Company knew that the operation was dangerous and that injury to its improperly trained employees was substantially certain to occur and/or was inevitable, and that Atlantic Tool & Die Company, knowing this

hazard of placing these employees in this dangerous situation, continued to operate the 100 ton press line with these employees.

{¶ 26} Littell's expert, William Switalski, found that little or no training resulted in a higher likelihood of injuries in the instant case.

{¶ 27} Kerg had had only five weeks of experience as a trainee and had completed only one of 12 training lessons. Kerg had just returned from her holiday vacation and could not remember how to start the Littell reel. Despite Kerg's lack of training and her time off work prior to her shift, Fowler assigned Kerg to work with Kattas, an inexperienced forklift operator. In either case, automatic press operator or forklift operator, good experience comes only with practice. With the lack thereof, a higher likelihood of injuries is a substantial certainty. Thus, there exists a genuine issue of material fact as to whether harm to Kerg would be a substantial certainty.

{¶ 28} The final element of *Fyffe* requires that Atlantic, under those circumstances and with that knowledge, acted to require Kerg to continue to perform the dangerous task. An employer need not make an express order to the employee:

> Instead, to overcome a motion for summary judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the [plaintiff] to engage in that dangerous task.

*Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 696 N.E.2d 1044.

{¶ 29} On December 29, 2003, Fowler could have required Kerg to complete the remaining 11 video lessons and applicable written exams while experienced staff was on vacation. Instead, Atlantic assigned Kerg to work at a Littell reel with Kattas. Thus, there exists an inference that Atlantic required Kerg, even though inexperienced, to engage in the dangerous task of loading coils onto the Littell reel. Therefore, we find that there exist genuine issues of material fact regarding the third element of *Fyffe*.

{¶ 30} Kerg's first assignment of error is sustained.

Assignment of Error Number Two

> The trial court erred in granting summary judgment to defendant-appellee Littell International, Inc. on plaintiff's product liability claim against it.

{¶ 31} Kerg argues that the trial court erred in granting summary judgment in favor of Littell on her product-liability claim. We disagree.

{¶ 32} Former R.C. 2307.73, 149 Ohio Laws Part I, 382, 437, reads:

(A) A manufacturer is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, both of the following:

(1) Subject to division (B) of this section, the product in question was defective in manufacture or construction as described in section 2307.74 of the Revised Code, was defective in design or formulation as described in section 2307.75 of the Revised Code, was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code;

(2) A defective aspect of the product in question as described in division (A)(1) of this section was a proximate cause of harm for which the claimant seeks to recover compensatory damages.

{¶ 33} Thus, a claimant must prove by a preponderance of the evidence that the product is defective in manufacture or construction, design, or formulation, and that the defect is the proximate cause of his or her injury.

{¶ 34} We first address Kerg's claim for product liability based upon a defect in manufacture or construction. R.C. 2307.74 establishes when a product is defective in manufacture or construction:

A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction.

R.C. 2307.74.

{¶ 35} Kadunc's expert report, which is seven pages long, includes only one paragraph addressing Kerg's product-liability claim, and reads:

Littell, as stated above, knew that the loading operation was dangerous. Littell knew or should have known that that [sic] power expansion mandrels were in use in the industry. Littell provided materials from Warner Electric, one of their suppliers, ball bearing screws and splines and linear actuators. Such functional components could form the basis of a powered expansion mandrel. An even simpler design modification could have been made incorporating a manual crank operated from the rear of the machine. This was easily designed since the spindle was hollow and a modified spindle could have the crank in the rear of the machine out of harms way.

{¶ 36} Thus, Kadunc found that the Littell reel is defective because Littell knew or should have known that power expansion mandrels were in use in the industry; and in the alternative, Littell should have designed the Littell reel with the manual crank operational from the rear of the Littell reel, thus averting harm.

{¶ 37} We hold that Kadunc's expert report fails to address any alleged defect in manufacture or construction—specifically, whether the Littell reel, when it left the control of its manufacturer, "deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications * * *." Kadunc's report finds only that alternative designs may exist.

{¶ 38} Additionally, Kerg does not present other evidence in support of her claim for a defect in design or manufacture. Fowler testified that he did not know of any manufacturing defects in the Littell reel. Ho testified to the same, that he never knew of anything wrong with the Littell reel. Thus, there are no genuine issues of material fact regarding Kerg's product-liability claim alleging defect in manufacture or construction.

{¶ 39} Next, we address Kerg's product-liability claim based upon the product being defective in design or formulation. Former R.C. 2307.75, 149 Ohio Laws, Part I, 382, 438, sets forth when a product is defective in design or formulation:

(A) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if either of the following applies:

(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;

(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

{¶ 40} Thus, pursuant to R.C. 2307.75, a product-liability plaintiff may recover under two theories: the risk-benefit standard and the consumer-expectation standard. See *Perkins v. Wilkinson Sword, Inc.* (1998), 83 Ohio St.3d 507, 700 N.E.2d 1247.

In determining whether a product design is in a defective condition, a single, two-pronged test should be used: under the consumer expectation standard prong, a defendant will be subject to liability if the plaintiff proves that the product design is in a defective condition because the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; under the risk-benefit standard prong, a

defendant will be subject to liability if the plaintiff proves, by using relevant criteria, that the product design is in a defective condition because the benefits of the challenged design do not outweigh the risks inherent in such design. *Cremeans v. Internatl. Harvester Co.* (1983), 6 Ohio St.3d 232, 6 OBR 302, 452 N.E.2d 1281.

{¶ 41} Kadunc found that alternative designs existed in the industry when Littell sold its reel to Atlantic, including a power expansion mandrel or a rear manual crank. Kadunc failed to address that Littell offered these variations in design in order to build its reel to suit. For example, Atlantic chose the front manual crank, whereas another company may have chosen a rear manual crank based upon the physical location of the reel within its operation.

{¶ 42} Additionally, Kadunc failed to address the fact that the purchaser could change the manual crank from front to rear or vice versa in less than 30 minutes at its choosing.

{¶ 43} Regardless, Switalski, when asked whether a coil is less likely to fall off when using a power mandrel, stated:

You know, I might add to that that even in the circumstance of the accident and injury that occurred to Ms. Kerg here, even though she may have been reaching for the hand wheel at the time of her injury, she had not yet begun to turn the hand wheel. The same accident exactly can happen with a powered mandrel, because the actual expansion of the mandrel had not yet begun to take place when this coil fell.

{¶ 44} Former R.C. 2307.75(B), 149 Ohio Laws, Part I, 382, 438, sets forth a nonexhaustive list of factors for consideration when assessing the foreseeable risks of a product, and reads:

(B) The foreseeable risks associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;

(3) The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer.

{¶ 45} Former R.C. 2307.75(C), 149 Ohio Laws Part I, 382, 438, sets forth a nonexhaustive list of the factors for our consideration, assessing the benefits associated with the design or formulation of a product, and reads as follows:

(C) The benefits associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;

(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;

(3) The nature and magnitude of any foreseeable risks associated with such an alternative design or formulation.

{¶ 46} However, prior to addressing the foreseeable risks and the benefits of the Littell reel design, we must address R.C. 2307.75(E) and (F), which act as exceptions to R.C. 2307.75(A). R.C. 2307.75(E), 149 Ohio Laws, Part I, 382, 439, reads:

(E) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

{¶ 47} In applying R.C. 2307.75(E) to the facts of this case, we conclude that Kerg's hand injury was caused by an inherent characteristic of the Littell reel. The Littell reel was designed to permit a press operator to apply keepers to the mandrel and the coil in order to hold the coil in place. Kerg's hand was injured when the coil fell before she had applied the keepers in place. Kerg's hand was not injured because of a design defect in the front manual crank. Nor can any of the aforementioned parts be eliminated without substantially compromising product usefulness, namely, the crank or the keepers.

{¶ 48} Furthermore, the Littell reel was designed to permit the buyer to build the reel to suit and to change the manual crank's front or rear placement as needed in less than 30 minutes. Had Littell designed the reel without these options, press operators might be subject to even greater danger. Additionally, R.C. 2307.75(F), 149 Ohio Laws, Part I, 382, 439, reads:

(F) A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages

without substantially impairing the usefulness or intended purpose of the product.

{¶ 49} Kerg argues that a technically feasible alternative design or formulation was available that would have prevented her hand injury—namely, use of a power expansion mandrel or rear manual crank. Littell not only admits that these alternatives exist, but argues that it offered these alternatives to Atlantic.

{¶ 50} Regardless, Kerg fails to present any evidence that a defect in the Littell reel was a proximate cause of her injury, via expert report or otherwise. Thus, we hold that there are no genuine issues of material fact regarding Kerg's claim for product liability against Littell.

{¶ 51} Kerg's second assignment of error is overruled.

{¶ 52} The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BOYLE, J., concurs.

COONEY, P.J., concurs in part and dissents in part.

COONEY, Presiding Judge, concurring in part and dissenting in part.

{¶ 53} I respectfully dissent regarding the first assignment of error involving Atlantic. I concur, however, with the majority's disposition of the second assignment of error related to Littell on the product-liability claim.

{¶ 54} I would affirm summary judgment for Atlantic because Kerg has failed to demonstrate the second prong of the *Fyffe* test, knowledge by the employer that if Kerg is subjected to such a dangerous procedure, harm will be a substantial certainty.

{¶ 55} As the majority correctly points out, Kerg was usually reminded to put the keepers on, but Kattas, who filled in for the regular forklift operator, apparently failed to remind her. The employer had no knowledge that the forklift operator failed to observe the keepers or remind Kerg. The mere knowledge of a risk—something short of substantial certainty—is not intent. *Fyffe*, 59 Ohio St.3d at 118, 570 N.E.2d 1108. Failure to remind Kerg to put the keepers on is negligent, at best.

{¶ 56} The majority places great emphasis on Kerg's lack of experience operating the Littell reel independently, without supervision. Yet part of the forklift operator's job is to observe the keepers in place. And although Kattas

did not frequently operate the forklift, he was experienced and licensed to operate it. He also had a thorough knowledge of loading the reel. Kerg learned that the keepers were a basic part of the operation as part of her on-the-job training. It is not as if this basic safety step was not taught to a trainee until lesson 12 in a 12–week program. Merely because a teenage driver is "in training" and backs the car out of the garage for the first time without a parent supervising does not mean the trainee-driver is not familiar with first closing the car door or opening the garage door before pulling out.

{¶ 57} The majority relies on *Page v. Taylor Lumber, Inc.*, 161 Ohio App.3d 644, 2005-Ohio-3104, 831 N.E.2d 1017, for the premise that inadequate training is a relevant factor that supports the substantial-certainty prong. *Page*, however, did not involve inadequate training, but cited *Vermett v. Fred Christen & Sons Co.* (2000), 138 Ohio App.3d 586, 602, 741 N.E.2d 954, for the proposition that inadequate training may be a relevant circumstance. In *Vermett*, the plaintiff-employee had trained on the machine only between 15 minutes and two hours and had never operated the press independently prior to the day of the accident. He had not been instructed what to do when a piece became stuck and could not recall being instructed to keep his hands out of the die space or reading the warning label on the press itself.

{¶ 58} In a recent case, *Estate of Merrell v. M. Weingold & Co.*, Cuyahoga App. No. 88508, 2007-Ohio-3070, 2007 WL 1776357, this court reversed the granting of summary judgment for the employer because a reasonable juror could conclude that the burners-employees were adequately trained regarding how to safely clear a jam in the baler when the door would not close properly. The defendant-employer, M. Weingold, could not cite any specific training given to any of its employees about how to safely clear a jam. No safety meetings had ever been conducted, nor were any safety manuals distributed regarding the safe operation of the baler. Id. at ¶ 32. In fact, one of the employees testified that he had not been trained on a safe way to clear a jam and just did it "whatever way's the easiest." Id.

{¶ 59} The instant case involves far different facts. Kerg had been trained for several weeks in putting on the keepers and had done the operation independently for two weeks before her accident. Granted, the supervisor or forklift operator would frequently remind her to do that basic step, but that reminder was an added safety measure by the employer. The dangerous condition here was Kattas's failure to remind Kerg, but there is no evidence that Atlantic knew that Kerg would be with a forklift operator who would not remind her of the basic step and that harm would be a substantial certainty.

{¶ 60} I would follow a more analogous case decided by this court to affirm summary judgment for Atlantic. We affirmed the granting of summary judg-

ment for the employer in *Burgos v. Areway, Inc.* (1996), 114 Ohio App.3d 380, 683 N.E.2d 345, in which the plaintiff-employee was provided on-the-job training in his position as a plater, a job that he had performed for four months. He was injured when he fell into a tank as he walked on the lips of the tank to retrieve racks that had fallen into the tank. His supervisor expected Burgos to retrieve the rack from the catwalk or use safety boards. Burgos, however, testified that the safety boards were never used to retrieve parts, and no one had ever told him to use the safety boards. Moreover, his trainer did not always use safety boards. Id. at 382, 683 N.E.2d 345. In 20 years of operation, no one had ever fallen into a tank at Areway, but plaintiff's expert stated that Areway must have known that injury was substantially certain to occur by the practice of employees retrieving racks from the lips of the tank. Id. at 383, 683 N.E.2d 345.

{¶ 61} Despite the expert's report and Burgos's testimony regarding his alleged inadequate safety training, we held that reasonable minds cannot conclude that the employer knew that injury was substantially certain to occur. Id. at 384, 683 N.E.2d 345. We held that where the employer makes safety devices available but does not enforce their use, the conduct is negligent or reckless, but not intentional, citing *Foust v. Magnum Restaurants, Inc.* (1994), 97 Ohio App.3d 451, 646 N.E.2d 1150. Burgos knew the safety boards were available, even though he was never told to use them to retrieve racks. "The injury to [plaintiff] was not substantially certain to occur because safety devices were available." Id.

{¶ 62} Likewise, in the instant case, Kerg received on-the-job training and knew the keepers had to be placed on the mandrel. Even though at the time of the accident, she was not reminded to put the keepers on, she knew that this basic safety measure existed. Usually, she was reminded to do so, but to hold the employer liable for an intentional tort under these unexpected circumstances flies in the face of *Fyffe*.

{¶ 63} Therefore, I respectfully dissent.