# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DAVID SIDLOSKI, Individually, and as Fiduciary of the Estate of Allyson Marie Sidloski, Deceased, | : | APPEAL NO. C-240570 TRIAL NO. A-2200702 |
| | : | |
| Plaintiff-Appellant, | : | |
| | | *JUDGMENT ENTRY* |
| vs. | : | |
| JOHN WYATT FISCHER, | : | |
| Defendant, | : | |
| and | : | |
| YAMAHA MOTOR CORPORATION, U.S.A., | : | |
| | : | |
| YAMAHA JET BOAT MANUFACTURING U.S.A., INC., | : | |
| and | : | |
| YAMAHA MOTOR CO., LTD., | : | |
| Defendants-Appellees. | : | |
| | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 11/7/2025 per order of the court.**


**By:**_____
　　　**Administrative Judge**

[Cite as *Sidloski v. Fischer*, 2025-Ohio-5069.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DAVID SIDLOSKI, Individually, and as Fiduciary of the Estate of Allyson Marie Sidloski, Deceased, | : | APPEAL NO. C-240570<br>TRIAL NO. A-2200702 |
| | : | |
| Plaintiff-Appellant, | : | |
| | | *O P I N I O N* |
| vs. | : | |
| JOHN WYATT FISCHER, | : | |
| Defendant, | : | |
| and | : | |
| YAMAHA MOTOR CORPORATION, U.S.A., | : | |
| | : | |
| YAMAHA JET BOAT MANUFACTURING U.S.A., INC., | : | |
| and | : | |
| YAMAHA MOTOR CO., LTD., | : | |
| Defendants-Appellees. | : | |
| | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: November 7, 2025

*Rittgers, Rittgers, & Nakajima, Charles M. Rittgers, The Linton Law Firm Co., L.P.A., Robert F. Linton Jr., April M. Bensimone, Durst Kerridge LLC, Paul R. Kerridge, Alex*

*J. Durst*, *Kelley Uustal, PLC, John J. Uustal* and *David M. Hammer,* for Plaintiff-Appellant,

*Montgomery Johnson LLP, G. Todd Hoffpauir, Bowman and Brooke LLP, Wendy Lumish* and *Frank Hosley,* for Defendants-Appellees.

NESTOR, **Judge.**

**{¶1}** This appeal stems from the tragic death of Allyson Sidloski ("Ally"), a University of Cincinnati student athlete who perished during a boating trip with friends. The events relevant to this case took place four summers ago on a jet boat manufactured by defendants-appellees Yamaha Motor Co., Ltd., Yamaha Motor Corporation, U.S.A., and Yamaha Jet Boat Manufacturing U.S.A., Inc., ("Yamaha"). After the trial court granted summary judgment in favor of Yamaha, plaintiff-appellant David Sidloski, individually and as the fiduciary of Ally Sidloski's estate ("the Estate"), timely appealed. Because we find genuine issues of material fact exist as to (1) the proximate cause of Ally's death, (2) whether Yamaha failed to adequately warn Ally of the dangers of carbon monoxide ("CO") while seated near the stern of the boat, and (3) whether Yamaha's boat was defectively designed, we sustain the Estate's three assignments of error and reverse the judgment of the trial court.

## I.   *Factual and Procedural History*

**{¶2}** Ally Sidloski was a 21-year-old junior at the University of Cincinnati who played on the women's soccer team and held a near-perfect grade point average. On May 22, 2021, Ally and a group of approximately 13 friends went boating on a 2018 212X Yamaha jet boat on Harsha Lake in Bethel, Ohio. However, this summer lake outing with friends took a tragic turn.

**{¶3}** Witnesses testified that Ally spent about 30 minutes sitting on a platform at the stern of the boat during the afternoon. Some passengers on the boat indicated that Ally had complained about smelling exhaust, but she had not mentioned it to the boat operator John Fischer ("Fischer"). At some point, one of Ally's companions fell off her board while wakeboarding, so the boat turned to pick her up. As the boat stopped, Ally exited from the boat into the water at the rear of the boat.

Among other disputed facts, the parties disagree about how long Ally was in the water. Witnesses on the boat that day testified she was above water for 30 seconds to a minute. Suddenly, Ally vanished into the lake. She was not wearing a life jacket.

{¶4} Fellow passengers immediately dove in to help, but they could not find Ally. Someone at the lake called 9-1-1. An officer contacted Ally's parents to inform them she was missing. Hours later, Ally was found near the bottom of the lake. The medical examiner determined that the cause of death was drowning, and the contributory cause was CO intoxication. The carboxyhemoglobin level in Ally's blood registered at 34 percent.

{¶5} The Estate initially sued Fischer, the boat's captain, but later amended the complaint to include product-liability claims against Yamaha. These claims alleged defective design and failure to warn passengers about CO poisoning risks while seated on the upper swim platform.[1] Following discovery, Yamaha moved for summary judgment, which the trial court granted based on its evaluation of the Estate's evidence.

{¶6} The Estate now appeals, raising three assignments of error challenging the trial court's grant of summary judgment in favor of Yamaha. The Estate argues that genuine issues of material fact exist regarding (1) the proximate cause of Ally's death, (2) Yamaha's failure to warn, and (3) the defective design of the boat. Because the issues raised in each assignment of error overlap, we discuss all three assignments of error together for ease of analysis.

{¶7} After a review of the record, we agree that genuine issues of material fact remain on each of the fronts advanced by the Estate. We also find that, to the extent

---

[1] The parties dispute the characterization of the area of the boat Ally was sitting on prior to her death. For consistency's sake, we refer to this area as the "upper swim platform."

conflicting evidence or expert testimony must be resolved, that duty is properly entrusted to the jury. Accordingly, we sustain all three assignments of error, reverse the judgment of the trial court, and remand the cause for further proceedings.

## II.    Analysis

{¶8}   "When reviewing the decision of a trial court granting or denying a party's motion for summary judgment, an appellate court applies a de novo standard of review." *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30. "The appellate court conducts an independent review of the evidence without deference to the trial court's findings." *Id*. "It examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, [*see*] Civ.R. 56(C), and determines, as if it were the trial court, whether summary judgment was appropriate." *Id*.

{¶9}   The Supreme Court of Ohio has characterized summary judgment as "a potentially useful, but extraordinary, procedure" that provides a "shortcut" through the usual steps of litigation. *AAAA Ents. v. River Place Community Urban Redev. Corp.,* 50 Ohio St.3d 157, 161 (1990). Because summary judgment circumvents the traditional trial process, the moving party bears the burden of establishing that there are no genuine issues of material fact which would allow a reasonable jury to rule against it. *Id.*

{¶10} A trial court "may award summary judgment to a moving party who can show (1) 'that there is no genuine issue as to any material fact,' (2) 'that the moving party is entitled to judgment as a matter of law,' and (3) that 'it appears from the evidence or stipulation . . . that reasonable minds can come to but one conclusion and that conclusion is adverse to' the nonmoving party." *Wilson v. CSX Transp., Inc.*, 2025-Ohio-819, ¶ 20 (1st Dist.), quoting Civ.R. 56(C). Courts determine whether the

above criteria are met by applying a burden-shifting framework. *Id.* at ¶ 21. "First, the moving party must 'inform[] the trial court of the basis for the party's motion and identify[] those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim.'" *Id.*, quoting *Midland Credit Mgt., Inc. v. Naber*, 2024-Ohio-1028, ¶ 6 (1st Dist.), citing *Dresher v. Burt*, 1996-Ohio-107. Once the movant "has cleared this hurdle, the burden shifts to the nonmoving party to identify 'specific facts showing that there is a genuine issue for trial,' [*see*] Civ.R. 56(C), which must be based on more than 'unsupported allegations or the pleadings.'" *Id.*, quoting *Smathers* at ¶ 31. If the nonmoving party fails to meet its reciprocal burden, only then is summary judgment appropriate under Civ.R. 56. *Id.* Lastly, "[we] must construe the evidence before [us] most strongly in favor of the nonmoving party" in reviewing a trial court's summary-judgment decision. *Bliss v. Manville*, 2022-Ohio-4366, ¶ 1.

### Proximate Cause

{¶11} In its amended complaint, the Estate alleged several grounds for asserting that the boat's design was defective and unreasonably dangerous. The Estate based its arguments primarily on allegations that the boat's design (1) exposed passengers to dangerously high and potentially deadly levels of CO, (2) encouraged passengers to sit in areas where such exposure was likely, (3) lacked adequate safety measures to mitigate the risk, and (4) failed to include reasonable and adequate warnings regarding the dangers of CO during use.

{¶12} The Estate asserts that the trial court improperly granted summary judgment in favor of Yamaha based on the court's conclusion that Yamaha's design of the boat did not proximately cause Ally's death. The court based this conclusion on its finding that the record lacked any evidence that Ally was exposed to CO when she sat

on the upper swim platform or that sitting there contributed to her death. Specifically, the trial court found that the Estate failed to tie Ally's exposure to CO while sitting on the upper swim platform to her death. Therefore, the trial court concluded that there were no genuine issues of material fact for the jury to decide on the issue of proximate cause. The Estate maintains that genuine issues of material fact do exist with regard to whether the design of the boat, including the seating on the upper swim platform and the lack of adequate warnings about CO exposure, proximately led to Ally's death.

**{¶13}** Pursuant to R.C. 2307.73(A)(2), "[a] manufacturer is subject to liability for compensatory damages based on a product liability claim [] if the claimant establishes, by a preponderance of the evidence . . . [that] [a] defective aspect of the manufacturer's product . . . was a proximate cause of harm for which the claimant seeks to recover compensatory damages[.]" On this allegation, the trial court determined that the Estate failed to provide *any* evidence that the boat was defectively designed; therefore, no genuine issues of material fact remained for a jury to decide. However, summary judgment was premature. The Estate presented sufficient evidence to create genuine issues of material fact regarding the design of the boat and the proximate cause of Ally's death.

**{¶14}** The design of the boat presents factual issues as to whether Yamaha encouraged passengers to sit on the upper swim platform. The parties dispute the characterization of the part of the boat Ally was sitting on prior to her death. The Estate refers to the area as "rear-facing seats." Yamaha refers to the area as the "upper swim platform" and contends that the area should not be used for sitting while the engine is running. Both terms refer to the same area. However, the operator's manual at the time of Ally's death only referred to the lower part of the stern as the "swim platform."

{¶15} The evidence demonstrates that Yamaha outfitted the upper swim platform with cushions, cupholders, and radio controls. Yamaha admits the upper swim platform was designed for seating, but it asserts that passengers were only supposed to sit in that location when the boat's engine was off. However, no warnings on the boat explicitly advised passengers to avoid sitting on the upper swim platform while the engine was on. The Estate asserts that these plush amenities functioned as "anti-warnings," which may lead passengers to believe the upper swim platform is generally safe, even when the boat's engine is on. The conflicting characterizations of this area of the boat create a jury question of whether the boat was designed to encourage passengers to sit in that location, even when the engine may have been on.

{¶16} Next, the Estate presented the report of toxicology expert Dr. Lindell Weaver in support of its argument that Ally's exposure to and inhalation of CO while seated on the upper swim platform was a proximate cause of her death. Dr. Weaver opined that the levels of CO around the upper swim platform reached elevated levels of "hundreds to thousands" of parts per million. Dr. Weaver further opined that if Ally sat on the upper swim platform for 20-30 minutes, as an eyewitness confirmed she did, then she had a burden of CO in her blood before she got into the water at the rear of the boat. He further explained that she was exposed to high levels of CO while seated on the upper swim platform, and that it would have been "impossible" for Ally to have been poisoned to that degree while she was in the water behind the boat.

{¶17} In response, Yamaha asserts that any CO exposure Ally experienced while seated on the upper swim platform was "minimal" and that no other passenger reported symptoms associated with CO. Yamaha attributed Ally's death solely to her exposure to CO while she was in the water. However, the Estate's evidence supported its argument that Ally was exposed to a large amount of CO while sitting on the upper

swim platform. This created a genuine issue of material fact as to whether Ally's exposure while seated on the upper swim platform was a proximate cause of her death.

**{¶18}** The Estate also asserted that the trial court erred when it determined that Yamaha did not proximately cause Ally's death through a lack of adequate warnings. To support its conclusion, the trial court found "that the accident would not have occurred had she followed the label warnings." However, as discussed more fully below, reasonable minds may reach different conclusions about the clarity, adequacy, and visibility of the warnings. A reasonable jury could find that inadequate warnings on the boat proximately caused Ally's death by failing to apprise her of the dangers of CO poisoning while seated on the upper swim platform.

**{¶19}** "It is a well-established principle of tort law that an injury may have more than one proximate cause." *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 587 (1991), citing Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton on the Law of Torts*, § 41, at 266-268 (5th Ed. 1984). "The 'proximate cause' of a result is that which in a natural and continued sequence contributes to produce the result, without which it would not have happened." *Korengel v. Little Miami Golf Ctr.*, 2019-Ohio-3681, ¶ 75 (1st Dist.), quoting *Piqua v. Morris*, 98 Ohio St. 42 (1918), paragraph one of the syllabus. "In Ohio, when two factors combine to produce damage or illness, each is a proximate cause." *Murphy* at 588, quoting *Norris v. Babcock & Wilcox Co.*, 48 Ohio App.3d 66, 67 (9th Dist. 1988). On this point, the trial court seems to have applied a standard of but-for causation rather than the standard for proximate cause.

**{¶20}** In order for an act or event to break the causal chain, "[an] intervening act must be unforeseeable in light of all of the facts and circumstances." *Bleh v. Biro Mfg. Co.*, 142 Ohio App.3d 434, 441 (1st Dist. 2001), citing *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St.3d 609, 619-620 (1995). "The test for

foreseeab[i]lity is 'whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor.'" *Id.*, quoting *Queen City Terminals* at 619-620. Moreover, the foreseeability test does not require that a defendant should have expected the particular injury; it is sufficient that its act is likely to result in an injury to someone. *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 160 (1983), citing *Neff Lumber Co. v. First Natl. Bank of St. Clairsville, Admr.,* 122 Ohio St. 302, 309 (1930).

{¶21} The Estate's evidence demonstrated that elevated levels of CO surrounded the upper swim platform, that Ally sat in this area of high concentration for a period of time, and that she lost consciousness almost immediately upon entering the water after sitting in the area with elevated levels of CO. The Estate presented evidence about the adequacy of the warnings, pointing out several facts—like font size and label placement—that could lead a reasonable jury to decide that inadequate warnings proximately caused Ally's death. Dr. Alison Vrendenburgh, who earned her Ph.D. in industrial-organizational psychology and is an expert in Human Factors and Warnings, testified that the boat was unreasonably dangerous as designed because it lacked adequate warnings regarding CO poisoning while located on the upper swim platform. She explained that the boat did not have sufficient, clear, and obvious danger warnings posted to adequately warn passengers of CO exposure on the upper swim platform. Construing this evidence in the light most favorable to the Estate, we conclude that at a minimum the evidence created a genuine issue of material fact. It created a question for the jury regarding whether the boat's design proximately caused Ally's death by exposing passengers to dangerously high and potentially deadly levels of CO, encouraging passengers to sit in areas where such exposure was likely, and

lacking adequate warnings about CO exposure—even if each was one of multiple causes.

{¶22} Furthermore, determining that a defendant has proximately caused injury to a plaintiff requires, in part, a determination that an act produces a result through a "natural and continuous sequence." *Ornella v. Robertson*, 14 Ohio St.2d 144, 151 (1968). In *Ornella,* the Supreme Court of Ohio explained that, because a "natural and continuous sequence" depends on the facts and context of a given case, it is ordinarily an issue entrusted to the jury. *Id.* Proximate cause is only considered a matter of law "where reasonable minds could not differ with respect to the matter because the circumstances clearly indicate an *obvious* cause and effect relationship." (Emphasis in original.) *Id.* We do not agree that Yamaha's characterization of the events giving rise to this action constitute the kind of obvious cause-and-effect relationship which would make the proximate cause of Ally's death a matter of law rather than a question of fact. Therefore, as a question of fact, it is properly entrusted to the jury.

**Breach of Duty to Warn**

{¶23} Next, the Estate posits that the trial court erred when it granted Yamaha's summary-judgment motion on the Estate's failure-to-warn claim.

{¶24} When addressing the adequacy of the warning labels, the trial court referred to R.C. 2307.76, which sets forth the standard for defectiveness due to inadequate warning or instruction. The trial court explained that, in a product-liability case premised upon failure to warn or adequately warn, a manufacturer would not incur liability unless the claimant showed that the manufacturer failed to take precautions a reasonable manufacturer would take in presenting the product to the public.

**{¶25}** The standard for a product defect due to inadequate warnings is codified in the Ohio Revised Code:

a product is defective due to inadequate warning or instruction if . . . at the time of marketing if, when it left the control of its manufacturer, both of the following applied: (a) [t]he manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages; [and] (b) [t]he manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

R.C. 2307.76(A)(1).

**{¶26}** To succeed on a failure-to-warn claim, the Estate must prove that Yamaha "had a duty to warn against reasonably foreseeable risks, that [it] breached that duty, and that the [Estate] suffered an injury proximately caused by [Yamaha]'s breach." *Zang v. Cones*, 2015-Ohio-2530, ¶ 40 (1st Dist.). To establish that a manufacturer breached its duty to warn, "the plaintiff must show that 'the manufacturer knew, or should have known, in the exercise of ordinary care, of the risk or hazard about which it failed to warn.'" *Aldridge v. Reckart Equip*. Co., 2006-Ohio-4964, ¶ 72 (4th Dist.), quoting *Freas v. Prater Constr. Corp.*, 60 Ohio St.3d 6, 9 (1991), quoting *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 257 (1990).

**{¶27}** In addition, a manufacturer will not incur liability "unless it [is] shown

that the manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public." (Emphasis deleted.) *Freas* at 9. Citing Section 388 of the Restatement of the Law 2d Torts (1965), the Ohio Supreme Court in *Freas* explained that comment *g* offered more guidance into how a manufacturer discharges its duty. *Id.* The Restatement details that if a manufacturer exercises "reasonable care to give those who are to use the chattel the information which the [] supplier possesses, and which [it] should realize to be necessary to make its use safe for them and those in whose vicinity it is to be used[,]" it properly discharges its duty. *Id.* Correspondingly, "Comment *j* to Section 402A references failure to warn and adds . . . '[that,] [i]n order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.'" *Id.*

{¶28} The Estate argues that Yamaha's warnings needed to be specific, clear, conspicuous, tailored to reach users, and, if the risk is avoidable, the ability to avoid it explained. The Ohio Supreme Court addressed these issues in *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 198 (1981). The *Seley* Court outlined several circumstances under which a warning may be unreasonable or inadequate, referencing "[a] jury" and "[t]he fact finder." *Id.* A determination of the adequacy or reasonableness of a warning may be based on "in its factual content, its expression of the facts, or the method or form in which it is conveyed." *Id.* As a matter of fact, not law, the adequacy inquiry is appropriately resolved by a jury and not on a motion for summary judgment.

{¶29} Yamaha presented several sources of warnings to support its motion for summary judgment on the failure-to-warn claim: guidance and warnings approved by the National Marine Manufacturers Association ("NMMA") and American Boating and Yacht Council ("ABYC"), warnings contained in the operator's manual, and the

warnings on the boat itself. Yamaha further claims that Fischer's actual practice, instead of relying on the boat's operation manual, was to simply watch what other people did and learn how to operate the boat that way. However, we conclude that NMMA/ABYC guidelines are not dispositive, Yamaha is not entitled to the application of the "read and heed presumption" on summary judgment, and that any question of joint liability on Fischer's part based on the operator's manual is an issue for the jury to decide.

NMMA/ABYC Guidelines and Compliance

**{¶30}** In support of its motion for summary judgment, Yamaha argues that the warning labels on the boat complied with both NMMA and ABYC standards. Yamaha also relies on a "Carbon Monoxide Poisoning NMMA Brochure" provided to Fischer at the time of sale, which had a checklist to advise and educate all passengers about the symptoms of CO poisoning and where CO may accumulate. The brochure warned that if a person smelled exhaust, then that person was inhaling CO. In addition, Yamaha notes the warnings in the owner's manual and avers that Fischer, as the captain of the boat, selected which warnings to read and heed.

**{¶31}** Yamaha asserts that its compliance with the NMMA and ABYC standards insulates it from any liability in Ally's death. At the outset, Ohio courts have not concluded that the industry standards are binding. In fact, other state courts have emphasized that ABYC guidelines are "entirely voluntary." *See Vesper Maritime Ltd. v. Lyman Morse Boatbuilding, Inc.*, 502 F.Supp.3d 551, 556 (D. Me. 2020). Moreover, the NMMA website[2] states that it seeks to help manufacturers, like Yamaha, ensure

---

[2] National Marine Manufacturers Association, *Boat & Yacht Certification Program*, https://www.nmma.org/certification/boats (accessed Oct. 21, 2025) [https://perma.cc/MBB5-VR9N].

that their boats are built to ABYC's standards, which are permissive. The NMMA offers membership to boat manufacturers, but it is not a mandatory safety organization. The fact that these warnings may have been compliant with permissive industry guidance does not preempt the Estate's failure-to-warn claim.

"Read and Heed" Presumption and Warning Adequacy

**{¶32}** We next address the trial court's application of the "read and heed" presumption. The trial court found that, where a warning was given, a seller may reasonably assume it would be read and heeded. A product with such a warning is considered neither defective nor unreasonably dangerous where following the warning renders the product safe for use. To support its conclusions about the consumer's obligation to read and heed warnings, the trial court cited *Freas,* 60 Ohio St.3d at 6.

**{¶33}** In *Freas*, the Court applied the "read and heed" presumption where the operator of a boom crane was required to read the crane operator's manual, was seen reading the operator's manual, and was known to observe the safety features of the boom crane. *Id*. at 10. After he died operating the boom crane in a way prohibited by the operator's manual, the court reasoned that the manufacturer took appropriate precautions, because it placed the warnings in a place where the boom crane operator, the actual injured party, was required to read them. *Id*. Therefore, the manufacturer of the crane was entitled to a presumption that those warnings would be read and heeded. *Id.*

**{¶34}** The trial court applied *Freas* to the facts of this case despite the lack of evidence that Ally similarly read the operator's manual or any of the warnings affixed to the boat by Yamaha. The court determined that Yamaha was protected by the "read and heed" presumption. Moreover, the court stated that, to impose liability on a manufacturer for breach of a duty to warn, the claimant must show that the breach

was the proximate cause of the injury. Because it had determined that the Estate had not proven proximate cause, the court concluded that no reasonable jury could find in favor of the Estate on the issue of the adequacy of the warnings.

**{¶35}** However, the present case presents several important distinctions from *Freas*. Unlike the boom crane operator in *Freas,* Ally was not the operator of the allegedly defective product that caused her death. In *Freas*, the warnings were put in a manual the decedent was required to read as part of his job. *Id.* Passengers of a boat are not generally required or expected to read the manuals meant for operators.

**{¶36}** The *Freas* Court also undertook an additional step in its analysis before applying the "read and heed" presumption: it examined the adequacy of the warnings within the full factual context of the case. *Id.* Yamaha contends that the warnings affixed to the boat reinforced the warnings in the manual and adequately warned of the dangers of CO poisoning. The relevant labels on the helm of the boat stated, "WARNING: carbon monoxide (CO) can cause brain damage or death" accompanied by a flotation device reminder and a warning to avoid applying the throttle when passengers are at the rear of the boat. Four warnings were also placed on the back of the boat. These labels were located near the lower swim platform, which would be directly behind the ankles of a passenger seated on the upper swim platform where Ally was sitting. Of the four affixed warnings, only one mentioned CO. It stated, "WARNING: carbon monoxide (CO) can cause brain damage or death." It also warned that "[c]arbon monoxide will be around the back of the boat while the engine is running," listed signs of CO poisoning, and advised passengers to "move to fresh air" if they experienced symptoms. The warning also included a rudimentary diagram in which a puff of CO exits the back of the boat. We find that reasonable minds could reach different conclusions about whether this warning and diagram adequately

warned passengers of the dangers of sitting on the upper swim platform, in addition to warning passengers about carbon monoxide "around the back of the boat." Such determinations are ones for a jury.

**{¶37}** Notably, as the Estate points out, even if the warnings were adequate and visible, none of the labels on the boat mentioned the risk of CO poisoning while sitting on the upper swim platform. According to Dr. Lindell Weaver, the Estate's carbon monoxide poisoning expert, Ally was exposed to CO, without warning, on the upper swim platform. The CO warnings were not placed in an area where a person seated on the upper swim platform could be expected to see them. The labels were in a very small font and were obscured from the view of a person sitting on the upper swim platform. Yamaha also presented a picture of Ally holding onto the lower swim platform.[3] Yamaha argues that, in the picture, Ally observed the transom labels near the lower portion of the swim platform and ignored them. The problem here is two-fold: there is a factual dispute regarding how long Ally was in the water, and the assertion that she actually saw the warnings upon exiting the lower platform is speculative at best. The Estate points out that its expert testified that Yamaha used small font on its warnings and that a passenger would likely have to get close to the label to read it. Further, even if Ally were looking at the label about CO on the transom of the boat, none of the labels mentioned a risk of CO poisoning while being seated on the upper swim platform.

**{¶38}** The Estate's experts also provided testimony that these warnings were inadequate and failed to apprise Ally of the risks of CO poisoning while seated on the

---

[3] Yamaha makes a point of observing that Ally was not wearing a life jacket in the photo. However, the court notes that Yamaha promotional materials regularly display passengers with no life jackets.

upper swim platform. Dr. Weaver testified to elevated levels of CO around the swim platform when the boat's engine was running. Citing the testimony that Ally sat on the upper swim platform for 20-30 minutes, he concluded she was exposed to high levels of CO during that time, and she had a burden of CO in her blood before she got into the water at the back of the boat.

**{¶39}** Robert Swint, the Estate's accident reconstruction expert, opined that the boat lacked sufficient, clear, and obvious warnings posted on the boat stating that the occupants should not be located on the upper swim platform when the engine was operating. He explained that, after numerous tests were performed, these warnings could not be seen from the seated section of the upper swim platform. He opined that Yamaha effectively encouraged people to sit on the upper swim platform, knowing about the risk of CO poisoning, yet failed to inform a passenger seated there of the risk.

**{¶40}** Yamaha's general manager, Yasuhiko Henmi, stated that the seats on the upper swim platform were only to be used when the engine was turned off. Moreover, he testified that a passenger did have the ability to see the rear boat labels if they were to look down when sitting in that area. At most, this testimony demonstrates the genuine issues of material fact surrounding the issue of whether the warnings were adequate. As this court has held, "[a]ny conflict in testimony, including that of experts, is a question to be resolved by the jury." *State v. Jones*, 1983 Ohio App. LEXIS 11647, *12 (1st Dist. Apr. 27, 1983). Construing the evidence presented in favor of the nonmoving party, as we are required to do, we conclude that genuine issues of material fact exist as to whether Yamaha failed to properly warn against CO poisoning while seated on the upper swim platform.

Operator Warnings

**{¶41}** Yamaha frequently references the responsibility of Fischer as the

"captain" of the vessel. It asserts that Fischer failed to read many of the warnings in the operator's manual and claims that he took a "learn by doing" approach to his boatmanship.

**{¶42}** The operator's manual included warnings to read the manual carefully before operating the boat, to wear a Coast Guard approved flotation device, and to stay away from the swim-platform area while the engine was running as one could inhale CO and experience brain damage or death. All the warnings in the operator's manual were intended to be read by the boat operator, not passengers. While the manual mentioned that operators should inform passengers of what was contained in the operator's manual, the warnings were never communicated to passengers by Yamaha.

**{¶43}** Even if we assume that these warnings were meant to be communicated to passengers, we still find a genuine issue of material fact as to whether the warnings adequately warned passengers about the danger of CO poisoning while sitting on the upper swim platform. Neither the operator's manual nor the brochure mentioned the dangers of CO poisoning at or around the upper swim platform. In fact, neither document even mentioned an "upper swim platform" at all. The operator's manual mentioned the *lower* portion of the platform, directly behind the exhaust, which it labeled "the swim platform."

**{¶44}** The Estate also argues that the operator's manual contradicts itself. Yamaha argues that there were warnings against being near the exhaust ports at the rear of the boat while the engine was running. Yet, the operator's manual explicitly stated that the operator should not apply the throttle when anyone was at the rear of the boat, but instead "should turn the engine off or *keep it at idle*." (Emphasis added.) The warnings and manual send mixed messages about the demarcation of the swim platform, and they contain inconsistent language about passengers' presence at the

rear of the boat while the engine idles. A jury determination is the proper avenue to resolve the factual issue of whether the warnings are adequate despite inconsistencies between these conflicting provisions.

{¶45} After reviewing the operator's manual and the warnings near the lower swim platform (on the transom of the boat), the trial court held that there was no failure to warn passengers like Ally. It determined that Ally did not read or heed any of the warnings provided by Yamaha and that if she had followed them—or if Fischer had read and heeded them—she would not have died. We find that the evidence presented by the Estate, at the very least, creates a genuine issue of material fact as to the adequacy of the CO warnings, including those in the operator's manual.

{¶46} Furthermore, any duty on the part of Fischer did not necessarily shield Yamaha from its own duty to warn consumers of an inherent danger of its vessel. Unless the evidence is "so compelling that reasonable minds can reach but one conclusion," issues of comparative negligence are questions of fact for the jury to resolve. *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 646 (1992), quoting *Hitchens v. Hahn*, 17 Ohio St.3d 212, 213-214 (1985); *Shinaver v. Szymanski*, 14 Ohio St.3d 51 (1984). To the extent that Fischer's actions proximately caused Ally's death, we find that the apportionment of fault between joint tortfeasors is properly left to the jury.

{¶47} Based on the expert testimony and the testimony of its own representative, Yamaha knew (or at least should have known) that dangerous levels of CO collected around the upper swim platform of the boat. The warnings in the operator's manual, the NMMA brochure, and the on-product labels all fail to mention the risk of CO poisoning with regard to the upper swim platform. Further, even with the references to CO in some of the boat's warnings, Yamaha did not place any warning

on the upper swim platform.

{¶48} Again, after our review of the extensive record in this case, we find that a genuine issue of material fact remains about whether Yamaha adequately warned the passengers of its boat about the danger of CO exposure on the upper swim platform. Consequently, the trial court improperly granted summary judgment in favor of Yamaha on this issue.

### *Design Defect*

{¶49} Next, the Estate alleges that the trial court's conclusion that the boat was not defectively designed was erroneous because it failed to employ the complete statutory analysis set forth in R.C. 2307.75 and because, based on the evidence presented by the parties, there remained genuine issues of material fact as to whether the boat was defectively designed.

{¶50} Pursuant to R.C. 2307.75(A), a product is defective in design or formulation if, "at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of [this statute] exceeded the benefits associated with that design or formulation as determined pursuant to division (C)." R.C. 2307.75(B) sets out a non-exhaustive list of factors to be weighed in the risk-benefit analysis mentioned in division (A). For example, courts should consider the nature and magnitude of the risks of harm associated with reasonably foreseeable uses of the product, the likely awareness of consumers of those risks based on warnings or general knowledge, and the likelihood that the design would cause harm. R.C. 2307.75(B). Of these factors, the Estate emphasizes that a product's warnings are but one factor to be considered in the entire analysis.

{¶51} The trial court determined that the Estate's design-defect claim failed

23

because of the existence of some warnings on the boat and in the manual about CO. However, the trial court erred when it treated this one factor as dispositive of the entire design-defect analysis.

**{¶52}** Under R.C. 2307.75, "a product liability plaintiff may recover under two theories: the risk-benefit standard and the consumer-expectation standard." *Kerg v. Atlantic Tool & Die Co.*, 2008-Ohio-2364, ¶ 40 (8th Dist.), citing *Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St.3d 507, 508 (1998). "[A] product is defective in design 'if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner *or* if the benefits of the challenged design do not outweigh the risk inherent in such design.'" (Emphasis in original.) *Perkins* at 508, citing *Knitz v. Minster Machine Co.*, 69 Ohio St.2d 460 (1982), syllabus. Importantly, these standards are not mutually exclusive but instead constitute a cohesive, two-pronged test. *Id.*, quoting *Cremeans v. Internatl. Harvester Co.*, 6 Ohio St.3d 232 (1983), syllabus. Therefore, "'if the *jury* concludes that one standard is not met, the *jury* may consider the other standard.'" (Emphasis added.) *Id.*, quoting *Beavercreek Local Schools v. Basic, Inc.*, 72 Ohio App.3d 669, 693 (2d Dist. 1991).

**{¶53}** Here, the Estate argued that Yamaha's boat was defective based on the factors in R.C. 2307.75(A)-(C). This risk-benefit analysis outlines the factors for the foreseeable risks in provision (B) and the factors for the benefits in provision (C). R.C. 2307.75(B) and (C). The very language of R.C. 2307.75(B) and (C) state that the risks and benefits associated with the design or formulation of a product "*shall*" be determined by considering the factors in each. (Emphasis added.) The Ohio Supreme Court has repeatedly recognized that "[the] use of the term 'shall' in a statute connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary." *Wilson v. Lawrence*, 2017-Ohio-1410, ¶ 13, citing *State ex rel.*

*Cincinnati Enquirer v. Lyons*, 2014-Ohio-2354, ¶ 28.

**{¶54}** Here, we see no indication that "shall" meant anything other than "must." Therefore, the trial court was under a mandatory obligation to consider the factors in R.C. 2307.75(B) and (C), among any others, and determine whether the risks outweighed the benefits of Yamaha's design. However, the trial court did not do so. The trial court considered a single factor concerning warnings when it granted summary judgment in favor of Yamaha. Therefore, the trial court improperly applied R.C. 2307.75, as it was obligated to analyze each factor under the statute.

**{¶55}** Moreover, R.C. 2307.75(D)-(F) contemplates the defenses to a design-defect claim. In response to these defenses, the Estate argued that a technically and economically feasible alternative design could have been to either eliminate the seating on the upper swim platform or install a catalytic converter to substantially reduce CO emissions, as contemplated by R.C. 2307.75(F).

**{¶56}** In considering these defenses, the trial court focused on the lack of expert testimony informing the "complex and technical" issue of whether the omission of a catalytic converter served as a defect. The trial court held that no reasonable jury could find in favor of the Estate. We disagree. The Estate's expert, Robert Lux, testified that he would not opine as to any defect with Yamaha's engine, but a catalytic converter would substantially reduce the overall emission of CO, which would reduce risks associated with CO poisoning. Further, Dr. Vrendenburgh opined that an alternative design might involve removing the seats from the upper swim platform because of the danger of CO poisoning to the passengers in that area of the boat. The trial court interpreted this as the Estate asserting that the boat was defective because it lacked a catalytic converter; however, we read this as an assertion that a catalytic converter was one potential feasible design alternative. Where reasonable minds

could differ, as here, the question of that feasibility should be left to the jury.

**{¶57}** At a minimum, there exists a genuine issue of material fact as to whether a technical and economically feasible alternative design of the boat was available at the time it left Yamaha's control that could mitigate risk under a risk-benefit analysis.

### III. Conclusion

**{¶58}** Having sustained the Estate's three assignments of error in light of our holding that there remain genuine issues of material fact regarding the defective design of the boat, the failure to warn of CO exposure while sitting on the upper swim platform, and whether alternative designs of the boat were economically feasible and needed, we reverse the trial court's grant of summary judgment in favor of Yamaha on the Estate's product-liability claims and remand the cause for further proceedings consistent with this opinion and the law.

Judgment reversed and cause remanded.

**BOCK, P.J.,** and **MOORE, J.,** concur.